Argued September 25, 1928, reversed January 22, rehearing denied September 17, 1929.

YAMHILL ELECTRIC COMPANY *v.* CITY OF McMINNVILLE ET AL.

(274 Pac. 118; 280 Pac. 504.)

310

318

For appellants there was a brief over the name of *Messrs. Bowerman & Kavanaugh,* with oral arguments by *Mr. R. L. Conner* and *Mr. Jay Bowerman.*

For respondent there was a brief over the name of *Messrs. Vinton & Tooze* and *Mr. Eugene E. Marsh,* with oral arguments by *Mr. Walter L. Tooze, Jr., Mr. A. A. Smith* and *Mr. Clarence Butt.*

*Mr. Charles A. Hardy, Mr. S. M. Calkins* and *Mr. W. C. Bristol* on brief, *Amici Curiae.*

McBRIDE, J.—In the judgment of the writer this is a case the decision of which involves very far-reaching and important consequences far beyond the mere financial results which may flow from a decree for or against either of the immediate parties. For this reason, and in order that every available source of information and precedent might be thoroughly examined, its decision has been considerably delayed.

The contention of the plaintiff may be briefly stated as follows: First, the defendant, as a municipal corporation, possesses, within its municipal limits, plenary

power to supply its citizens and residents with electricity for all purposes. Second: Outside of its limits it is no longer a municipal corporation, but is in the same category as any other business corporation supplying electric light and power to consumers and as such must be held subject to the control of the Public Service Commission. Third: Even under such circumstances, its charter must be broad enough to authorize it to conduct such business outside of its corporate limits. Fourth: The charter of the City of McMinnville does not authorize the city to carry on the business contemplated by it in the present instance. Fifth: That supplying electric energy to consumers, outside of its municipal limits independent of the control of the Public Service Commission, was not contemplated by or within the intent of the legislature in the various statutes hereinafter considered and cited. Sixth: That if so contemplated, said statutes are discriminatory and unconstitutional and in violation of the Constitution of this state and the Fourteenth Amendment to the Constitution of the United States and are void. Seventh: That, on account of their discriminatory and unconstitutional features, the exception in favor of municipal corporations, so far as they may exempt them from control by the Public Service Commission when engaged in furnishing electrical energy beyond municipal limits, should be treated as void and the municipality, to that extent, be held to the same control and accountability to the Public Service Commission as any private or semi-private corporation engaged in a like enterprise.

On the part of the city, it is claimed that the needs of the present and a reasonable provision for the future justified the construction of its present plant;

that its present capacity, while exceeding its actual necessities at this time, is not excessive taking into consideration the probable future increase in population, and, having this present excess in capacity, it has and it is utilizing its surplus capacity by selling light and power to customers in the vicinity as it is authorized to do by its charter and the statutes hereinafter cited and considered in this opinion.

It is further claimed that, as the state has authority to construct and operate public utilities on its own account, and municipal corporations being mere agencies or machinery by which the state exercises certain portion of its sovereignty, the state can constitutionally invest them with the power to exercise in their own interest any right in relation to the building and operation or transmission of electric power and light, which the state itself could exercise under like conditions.

The intent of the city to enter into the general business of selling electric light and power outside of its limits is denied, and it is claimed that it has not and does not intend to sell such element outside of its municipal limits beyond the present surplus capacity to produce the same, which surplus, it claims is only a prudent and business reservation for future needs.

It is further claimed that, if the exception of municipalities should be held unconstitutional, it is so interwoven and connected with the body of the act, that the court cannot say that the act with the exception omitted would have been passed by the legislature and the consequence would be to render the whole public service act void thereby leaving the plaintiff wholly without remedy in the present suit.

Having thus stated the contentions of the parties as they appear to us from the briefs, and reserving

the enumeration of some minor contentions for further statement in the progress of our discussion, we will consider the construction of Section 6030, Or. L., taken in connection with Section 3768, Or. L., which sections are as follows:

"§ 6030. Term 'Public Utility' Defined. The term 'public utility' as used herein, shall mean and embrace all corporations, companies, individuals, associations of individuals, their lessees, trustees or receivers (appointed by any court whatsoever), that now or hereafter may own, operate, manage or control, any plant or equipment or part of a plant or equipment in this state for the transportation of persons or property by street railroad as common carriers, or for the production, transmission, delivery or furnishing of heat, light, water or power, and any and all whether either directly or indirectly to or for the public, and whether said plant or equipment or part thereof is wholly within any town or city, or not. No plant owned or operated by a municipality shall be deemed a public utility under or for the purposes of this act."

"§ 3768. Cities may Own Public Utilities. Incorporated cities and towns, when the power to do so is conferred by or contained in their charter or act of incorporation, are hereby authorized to build, own, operate and maintain waterworks, water systems, railways and railroads, electric light and power plants, within and without the boundaries of said corporation, for the benefit and use of the inhabitants thereof, and for profit, and to that end may in connection with their water systems sell and dispose of their water for irrigation and for other purposes to people residing without the boundaries of such municipal corporation, and may build, acquire, own and operate railways, operated by steam, electric or other power within and without the boundaries, of such municipal corporation and running from said municipal corporation to other towns, cities and points without the boundaries of said municipal corporation, and to that end may acquire right of way, ease-

ments, real property within and without its boundaries for any such purpose. For the purpose of exercising such powers such cities and towns are conferred with the power and authority to bring actions for the condemnation or taking of private property for public use in the same manner as private corporations are now authorized or permitted to do under the laws of the state.''

It may be observed that the title of the section, ''Cities may Own Public Utilities,'' is not contained in the original act, but is merely added by the compiler for convenience in reference. The history of legislation leading up to this enactment of Section 6030, Or. L., may be summarized as follows: Prior to 1911 there was no statute regulating any public utility except railroads, but in that year Chapter 279, General Laws of 1911, passed placing certain public utilities under the jurisdiction of the Railroad Commission and providing the method of regulating them. The first section of this act is substantially the same as Section 6030, *supra*.

It may also be observed that the title of the Railroad Commission was subsequently changed to Public Service Commission, but no change has ever been made in Section 6030, Or. L., and it still stands as the law. It may be here noted that, while several amendments have been made to the act relating to the duties and method of procedure of the Public Service Commission, Section 6030, Or. L., has been preserved intact, and its initial position as the first section of this important act indicates that it is improbable that its provisions were unnoticed or not considered in subsequent legislation.

In 1913 the initial statute permitting incorporated cities and towns to construct water works, electric works, *et cetera,* was passed. It was similar to Sec-

tion 3768, *supra*, except that its operation was confined to cities of not less than 3,000 inhabitants.

In 1915 the act of 1913 was again amended by striking out 3,000 and inserting 1,000 as the minimum number of inhabitants.

In 1919 there was another amendment striking out the figures 1,000 and leaving the act as it now stands and as hereinbefore quoted. It will be seen that Section 3768, Or. L., and Section 3770, Or. L., by which the defendant city claims the right to sell light and power outside of its corporate limits, have stood unquestioned for years and that, if interpreted in the light of the language used, it would seem to give municipalities unlimited authority to engage in the business of dealing in electric energy (if authorized by their charters) to the same extent as a private corporation could do under the same circumstances. It is contrary to the general practice of legislation, almost without exception, to authorize municipalities to conduct any business so as to compete with private enterprises of the same nature. It is true that they are usually permitted to furnish their inhabitants with light and water and, in some instances, to maintain street railways; but these functions, while often termed proprietary, are in fact of a public character and primarily in the public interest, the central idea being that, within their own boundaries and for their own welfare and convenience, the citizens of a municipality should be permitted to manage their own affairs by their own methods so long as they do not interfere with the general laws of the state or the constitutional rights of citizens residing either inside or outside their boundaries. With few exceptions, the idea of state ownership or operation of public utilities has not found favor with the great majority

of our citizens. The deterrent cause has not been so much the existence of any constitutional inhibition as to the right of the state to engage in the general operation of public utilities, as a widespread feeling against the policy of the state competing with private enterprises engaged in like occupations.

■ Consequently, while there is no constitutional inhibition against the state building and operating a railroad, say, from Portland to Ashland, such an enterprise would find small favor, although the state heretofore built and for a number of years operated a freight and passenger line around The Dalles on the Columbia until the government constructed a canal and locks to take its place. What the state can do in this regard, we see no constitutional objection to its authorizing its municipal corporations, which are mere agencies of the state, also to do in such cases as it shall deem proper. In *Churchill* v. *Grants Pass,* 70 Or. 283 (141 Pac. 164), the constitutional power of the state to delegate to a municipality the right to construct and operate as a freight and passenger railroad, extending outside of the city boundaries, was fully upheld by this court. The road was constructed and, so far as known to the writer, is still in operation.

In *Pearce* v. *Roseburg,* 77 Or. 195 (150 Pac. 855), the ruling in *Churchill* v. *Grants Pass, supra,* was adhered to, but it was intimated that, although a municipality had a right to engage in railroad construction, it was probably poor business policy. In neither of these cases was the question of the relation of the municipality to the Public Service Commission, or the question of competition with private enterprises, raised or considered; in fact, in neither was there a likelihood of such competition ever exist-

ing. So, these two questions, as well as the sufficiency of charter authority in this particular case, may be considered open for discussion. Were we permitted to pass upon the policy or impolicy of statutes of the character of Section 3768, Or. L., strong reasons against their existence could be adduced, and have been eloquently urged on the hearing here by counsel for plaintiff and in the able briefs of counsel appearing *amici curiae* in this court.

■ ■ That permitting cities to engage in the business of selling light and power outside of their corporate limits without a central supervision of their activities will tend to stifle private enterprises, goes without saying. That such a venture by the City of McMinnville may have proved financially profitable to the municipal treasury will have a tendency to induce other municipalities to attempt like ventures, is not improbable. What the City of McMinnville is doing or attempting to do, Lafayette, North Yamhill, Carlton, Dayton and Willamina may also do, and we have at least a possibility of half a dozen towns competing with each other for the business of the surrounding country without any central authority to confine them within reasonable business limits. It is usually easy to vote bonds for such speculative purposes, especially where a considerable portion of the community are nontaxpayers, or merely nominal taxpayers. These and other objections might be urged as to the impolicy of the statute, but, between questions of policy and questions concerning the constitutionality of a statute, the distinction is wide. A statute may be impolitic even to the extent of being in a measure oppressive and yet be constitutional. As to the first, the remedy is legislative and as to the second, the remedy is with the courts. For the

purposes of this case, the distinction between acts of a city in its governmental capacity and those done in its proprietary capacity, need not be considered here. The construction of plants and lines for the purpose of generating and transmitting power or light is a public purpose and is so recognized by our statute, Section 7059, Or. L., which grants the right of eminent domain to such private corporations to the same extent that it is granted to railways and like corporations, and to the same extent that a like power is granted to municipalities by other sections heretofore quoted. Being a public purpose and being a function which the state itself could exercise without reference to its effect in the matter of competition with private corporations engaged in the same business, it follows, as was held in *Pearce* v. *Roseburg, supra,* and *Churchill* v. *Grants Pass, supra,* that the state has plenary power to delegate the right to exercise that function to municipalities, which, as before remarked, are, as to these matters, mere governmental agencies of the state.

Owing to the fact that no other state has a statute as broad as ours concerning the right of a municipality to dispose of electric energy outside of its boundaries, there is great dearth of authority touching constitutional limitations on such power. The following sections from Dillon on Municipal Corporations (5 ed.), Volume 3, will, however, afford some light upon the question now under discussion.

"§ 1299. Power of City to Supply Water to Other Cities and Beyond Its Limits—The purpose for which a municipality is authorized to construct water works or to contract for a supply of water is usually to supply its own needs and the needs of its inhabitants, and it may be laid down as a general rule that a grant of power to a municipality for these purposes gives

it by implication no authority to enter into the business of furnishing water to persons beyond the municipal limits. Nor does authority to provide water or light for its own use and for the use of its inhabitants authorize a municipality to go into the business of buying and selling water as a commodity to other municipalities. But in the absence of any constitutional restriction or prohibition, it is within the power of the legislature to authorize a municipality, at least as an incident to the construction and maintenance of its own water works, to contract with neighboring municipalities to supply water thereto or to their inhabitants. And in California it has been held that when a city is authorized to acquire waters and water rights beyond its limits, and in the exercise of that authority acquires the property of a water company, which under the constitution and statutes of that state is charged with the duty of supplying persons with water outside the city limits, the city becomes bound upon the purchase of the water rights and property of the company, to fulfil its constitutional and statutory obligations, and to supply the persons entitled to receive a supply from the source acquired by it from the water company. And where the contract with another municipality is confined to surplus waters which the city has in good faith acquired for its own purposes, but which it does not presently require, the contract has been sustained as within the power of the city.

"§ 1300. Power to Apply Surplus to Private Purposes. The idea underlying the construction of public utilities by a municipality or by a public service corporation is that the municipality or company in furnishing water or light or rendering other similar services does so for a public purpose; and, as we have seen, the fact that the water or light is furnished for the individual consumption or use of the inhabitants does not detract from the public purpose. But in the nature of things there are necessarily purposes of a peculiarly private nature which do not justify the municipality in exercising the power of taxation and

which do not permit either the municipality or the public service corporation to exercise the power of eminent domain. But whilst a private purpose cannot be the primary object of either the municipality or the public service corporation, the fact that incidentally and to a minor degree private purposes are served does not render the action of the public service corporation or municipality illegal. When a city owns, maintains, and operates its own water or light plant, it is to be reasonably expected that in the prudent management of its works some excess beyond the natural requirements of the public will arise; that there will be more surplus which will be available for disposal over and above such as it requires for its own purposes and such as its inhabitants can claim by reason of the prior duty which it owes them. With reference to the surplus so arising, the city may contract with private individuals for the private use thereof so long as it does so without affecting the supply which is required for public or *quasi*-public purposes. For example, if a city has legislative authority to erect a dam in connection with its water works, it may lawfully lease for private purposes any excess of water not required by itself for its inhabitants; or it may lease to private individuals the use of water flowing through its water system to enable them to generate power to create electricity where such lease does not impair the usefulness of the water works or the efficiency of the system for the municipal purposes for which they were acquired. Within these principles too, where a city has an electric lighting plant which is capable without any increased expense, except a small additional expense for fuel, of furnishing light to a very much larger number of customers than it has, it may, by contract, agree to extend its electric light service to points beyond the city limits, if its action does not materially impair the usefulness of its plant for the purpose for which it was primarily created.''

In an examination of the cases cited in the notes to the above sections, we find in many, if not most

of them, the statement that cities cannot *"without express legislative authority,"* supply consumers outside their limits with water and light.

In a note to Section 1299, *supra,* a doubt is expressed as to the power of a city to engage in the sale of water or electric energy as a primary business and, indeed, many of the authorities so hold; mostly, however, with reference to constitutional or statutory provision not present in the legislation in this state, but so far as the purposes of this case are concerned, it may be conceded that such is the law. The city in this case contends that, in view of its probable future growth and increase in population, it has erected a plant operated partly by water power, to a small degree by steam power generated by burning cordwood in its furnaces, and to a great extent by power produced by Diesel engines using oil, which, taken together and used to capacity, will be no more than sufficient to supply the peak-load that is or may be required at present with a reasonable reserve which (as near as we can figure it) will amount to about 400 kilowatts. But we think the evidence fairly indicates that the actual intention of the city was to create a surplus of power for the production of electricity more for the purpose of selling it to outsiders than to have it in readiness for future demands, which might be caused by the increase of population or manufactories and that to some extent it has manifested a disposition to become a competitor with the plaintiff.

■ ■ An infraction of the Constitution cannot be considered with reference to its extent. If it is an infraction of the Constitution to permit the city to go five miles into the country for the purpose of commercial sale of electricity, it is equally an infrac-

tion to permit it to go one mile; but whatever may be our opinion as to the policy of our statute, we believe it not to be subject to constitutional objection. It is plausibly and eloquently urged that it is discriminatory in that it permits a nontaxpaying municipality to compete in business with a taxpaying private corporation. But, as before indicated, the state may operate railways, electric power lines and telegraph or telephone lines and other like semi-public functions in direct competition with private corporations engaged in the same pursuits, and can delegate power to any of its municipal agencies to be exercised in the same manner within such limitations as it may prescribe and as the state itself might exercise them. It is purely an economic and political question to be solved by the legislative branch of the government. Whether the law has gone so far as to exempt from taxation that part of the business, which a municipality carries on outside of its limits, and in its proprietary capacity, is not here for determination and we do not pass upon it.

The question of classification, while a subject of judicial examination in some instances, is largely, though not entirely, a matter of legislative judgment. The statutes relating to jurisdiction of the Public Service Commission may be, as relating to the matter under consideration, divided into two classes. First, private corporations performing semi-public services, such as the operation of electric light and water plants; and second, municipal corporations which are themselves engaged in like services. The first are placed under the supervision of the Public Service Commission, and the second are expressly exempted from it. Whether the legislature deemed that municipal councils, municipal water and light commissions

and boards would so exercise their powers as to prevent extortion from consumers or so act as to avoid undue or destructive rivalry with private corporations, or whether in the legislative judgment a little rivalry would be of advantage to the consumers, are matters of conjecture. All classifications, whether for the purposes of taxation or otherwise, are usually more or less experimental, and, if not found workable in practice, can be, and frequently are, in practice repealed or changed. The law proceeds upon the theory that municipal commissions, as well as the Public Service Commission, will be composed of fair and just citizens who will not abuse their prerogatives, and we are unable to say that the classification here is so unreasonable as to be an infraction of the Constitution. But, if we were to concede that the classification is unconstitutional, we are confronted with the inescapable proposition, that to eliminate that part of the act which exempts municipalities from the supervision of the Public Service Commission and leave the act legally intact, much less to so construe it as to include municipally operated utilities which the act expressly excluded, would be contrary to all judicial precedent. The substance of the act is that all public utilities operated in this state *except* those operated by municipal corporations shall be subject to the control of the Public Service Commission. In order to bring municipalities within the purview of the act, we would have to so judicially revise it as to make it read in substance, "All public utilities *including* those operated by municipalities shall be subject to the supervision of the public service commission." To hold that the courts possess such power of judicial amendment, would be going beyond any precedent in the judicial history of this country

or any other. We are unable to say that the legislature would have passed the act in such a form as to include municipally owned and operated utilities. From the repeated re-enactment of this exception, and from the tenor of Sections 3768 and 3770, Or. L., the conclusion that the legislature would not have passed a law subjecting municipally owned plants to the regulation of the commission appears more reasonable, as a matter of speculation, than that it would have so acted.

We are not unmindful of the rule in some cases that, if the alleged unconstitutional provision of a statute can be eliminated and the remaining portion so left that it will carry out and express the general object intended by the legislature, the court will not declare the whole act void but that is not this case. Either the Statute of 1911 is void *in toto* or it is valid *in toto*. We are not without authority for this conclusion as is shown by the authorities cited by counsel for appellants: Lewis' Sutherland on Statutory Construction, § 306; *Connelly* v. *Union Sewer Pipe Co.*, 184 U. S. 540 (46 L. Ed. 679, 22 Sup. Ct. Rep. 431); *Low* v. *Rees Printing Co.*, 41 Neb. 127 (59 N. W. 362, 43 Am St. Rep. 670, 24 L. R. A. 702); *Marsh* v. *Hanley et al.*, 111 Cal. 368 (43 Pac. 975), and many others. So, to hold this statute and its kindred statutes void, would be to hold the whole act of 1911 void, which would leave the Public Service Commission without power to regulate any public utility except perhaps railroads, and the last state of plaintiff would be worse than the first.

It is urged that the exemption of municipalities from regulation by the Public Service Commission places the plaintiff in a position whereby it cannot compete on equal terms with the defendants and

would thereby violate the Fourteenth Amendment to the Constitution of the United States. If, as we have already stated, there can be no such thing as discrimination as applied to the state and its municipal agencies, and, if the classification of municipal corporations separately from private corporations is not technically unreasonable, this contention must be overruled and our previous discussion herein will apply to this branch of the case. Municipal and private corporations, being artificial entities created by law, have such authority and rights as the law gives them, no more and no less, and, unless a variant classification of them is clearly arbitrary and void of distinction in fact, it must be upheld. That in the long run it may appear that it might have been better policy to have placed municipalities under outside regulation can have no weight with us in interpreting a proposition of law. We deal with the law as it is, not as we may happen to think it ought to be. It is only ambiguity that is in the domain of interpretation and we find no ambiguity in the statute.

■ It is further contended by plaintiff that even conceding that municipalities are authorized to operate plants for the production and sale of electrical energy outside as well as inside their municipal boundaries, they have no authority to *deliver* such energy outside of their corporate limits; that they may convey such energy only to the boundary and deliver it there into agencies furnished by the consumer and not otherwise. The consumer must bring his "bucket" and have it filled at the city boundary. Section 3768, Or. L., substantially provides that—

"Incorporated cities * * *when the power to do so* is conferred by or contained in their charter or acts of incorporation, are hereby authorized to build, own,

operate and maintain * * electric light and power plants (for supplying electricity) within and without the boundaries of said corporation for the benefit and use of the inhabitants thereof and for profit.''

Section 3770, Or. L., in substance, provides that—

''Any such corporation ''shall have the right and (is) hereby authorized and empowered to *sell, supply* and *dispose of* * * electricity from such system to any person, persons or corporation within or *without* the limits of such incorporated city or in which such * * electric light and power system is operated,'' *et cetera.*

By the word ''plant'' is meant the whole system, machinery, power, poles, wire and anything necessary to complete the circuit. ''System'' has a like connotation: *Brown* v. *Gerald,* 100 Me. 351, 354 (61 Atl. 785, 109 Am. St. Rep. 526, 70 L. R. A. 472); *Cleveland, etc.,* v. *Scott,* 29 Ind. App. 519, 530 (64 N. E. 896); *Roebling & Sons* v. *Humboldt, etc.,* 112 Cal. 288 (44 Pac. 568); *Ewart* v. *Village of Western Springs,* 180 Ill. 318 (54 N. E. 478).

The ''system'' or ''plant'' may be erected or operated within or without the city and it would be a strained construction to confine delivery of electric energy to the city boundaries. While electric energy is an elusive species of property, the nature of which is not so well understood as that of milk or sugar, it is nevertheless property and authority to sell it would ordinarily imply the right to deliver to the purchaser either at the place of sale or at the place of its contemplated consumption. Another and very serious contention is that there is no charter authority permitting the City of McMinnville to sell or deliver electrical energy to consumers at points as distant as the McMinnville golf links is from the city boundary. It will be noticed that the authority of

cities to sell and supply electric energy to consumers outside of their corporate limits was originally granted by the Statute of 1911, *supra*, and now constitutes Section 3770, Or. L., which makes no reference to charter powers and in itself constituted a grant of authority to any city in the state, and has not been directly amended since that time except that in 1913 by Chapter 283, Laws of 1913, it was provided that incorporated cities of over 3,000 inhabitants "when the power to do is conferred by or contained in their charter," *et cetera*. This is the first we hear of reference to charter limitations or any particular number of inhabitants being required in or to enable a municipality to operate an electric plant. It also contained a further provision, which is of more than passing interest and which at the risk of frequent repetition we here repeat.

"Cities * * are hereby authorized to build, own, operate and maintain water works, water systems, railways and railroads, electric light and power plants within and without the boundaries of said corporation for the benefit and use of the inhabitants thereof and for profit, and to that end may in connection with their water systems sell and dispose of water for irrigation or other purposes to people residing without the boundaries of such municipal corporation."

It does not pretend to repeal Chapter 80, Laws of 1911, which conferred the right to sell electricity to persons residing outside the city, but only to substitute the act, just referred to, for Chapter 283, Laws of 1913.

The provisions of Chapter 283, Laws of 1913, and Chapter 80, Laws of 1911, do not conflict as to the right of electric companies to sell electric energy outside of the city limits so they can both stand and such evidently was the view of the learned compiler of the

Oregon Laws when Section 3770 was included in the Code in its present form. The requirement that char-. ter authority should exist before cities could take advantage of the previous act does conflict with Chap-- ter 80, Laws of 1911, and to that extent is a substitute for it.

15. The charter of McMinnville, so far as it immediately pertains to the matter in hand, limits the sale of electric energy to "citizens of said city and vicinity. "Vicinity" is a term of such relativity as would tax the powers of Einstein to define with any degree of precision. We might fairly say that man's eyes are in the vicinity of his brain, but be laughed to scorn if we said that his stomach was in the vicinity of either of those organs, or in describing Salem to one who had never been there we might say that West Salem, half a mile away, or Eola six miles away, or Independence, a little farther distant, were in the vicinity of Salem.

To illustrate the uncertainty and indefiniteness of the term one has only to refer to "Words and Phrases," Third Series, page 863, under that title, where we find cases wherein "vicinity" is held not to extend beyond a mile from the principal locality, others not to extend as far as two miles, others to the effect that it may extend as far as ten miles, some, that the term extends beyond the distance termed neighborhood, and others, that it has the same implication as "neighborhood." In all these divergent holdings, it is evident that the courts took into consideration the particular circumstances existing in the locality as we do here. There is still enough of the pioneer habits of association left, especially in the rural districts, to consider the resident two or three miles away as a neighbor and his residence as

in the vicinity; and especially since the era of automobiles which has almost annihilated distance, it is not unreasonable to say that a locality three or four miles away is in the vicinity of the town where the resident does business, and this is especially true in the case of playgrounds such as the golf links, which, from its name, may be inferred to be a resort for at least a portion of the sportively inclined residents of McMinnville.

If, using ordinary language, a resident of Salem should inquire as to the location of the McMinnville golf links, the answer of a Yamhill County man might well and probably would be, "in the neighborhood of McMinnville." While it would appear that some activities of the McMinnville electric light commission have gone as far, or perhaps farther than a reasonable interpretation of the charter authorizes, we are not prepared to say that in this particular instance, where the distance is perhaps three and one-half miles that the proposed service would be beyond the "vicinity" of McMinnville. In our view of the case, the question of surplus power or energy cuts no figure. It seems most probable that the alleged "surplus" is simply electric energy created for the very purpose for which it is being used, namely, for sale for profit, and to increase the funds in the city treasury. That this may be a special benefit to the taxpayers of McMinnville, tend to reduce the rates for light and power to its citizens, and increase its sinking fund for the redemption of bonds, if it has issued any, is probable. But, if the business is conducted for "profit," the law allows the city to so conduct it. That such a course will be regretted, and is in the long run bad economic policy, is in the opinion of the writer, speaking for himself and not for the court, inevitable, but we are

not here to decide this case upon our private views of economics but upon the law as it is written.

This case is important in its consequences and has consumed much of the time of the court. We have been aided by very able arguments of counsel and exceptionally clear and fair briefs, both by counsel and *amici curiae,* and after mature consideration, we conclude that the law is with the defendants and that the decree should be reversed, and it is so ordered.

REVERSED.

Rehearing denied September 17, 1929.

ON PETITION FOR REHEARING.

(280 Pac. 504.)

For appellants, *Messrs. Bowerman & Kavanaugh* and *Mr. R. L. Conner.*

For respondent, *Messrs. Vinton & Tooze, Mr. Eugene E. Marsh, Mr. Walter L. Tooze, Jr., Mr. A. A. Smith* and *Mr. Clarence Butt.*

*Mr. Charles A. Hardy, Mr. S. M. Calkins* and *Mr. W. C. Bristol, Amici Curiae.*

McBRIDE, J.—█ We have very carefully considered the able and exhaustive petition for rehearing filed by counsel for plaintiff and still adhere to our former opinion.

Much of the brief is taken up with a discussion of the economic results that would follow an adherence to our original opinion, and, to a certain extent, we agree with counsel in the view that participation by municipalities in enterprises such as furnishing water

or electric lighting outside its municipal limits is not in accord with sound economics or public policy, but states and municipalities often engage in activities, which, while not prohibited by their constitutions or charters, are unsound and sometimes disastrous.

Whether the legislation of this state, which we have discussed in the original opinion, is on the whole unwise, is a matter of private judgment. Looking backward, we may well conclude that the policy of the legislature in disposing of our school and university lands at a trifling price per acre was bad policy. But, it was not unconstitutional. It might be said that legislation, which authorized the state to guarantee the bonds of irrigation districts for a series of years, was unwise and not good economics. The result has demonstrated this, but the law was not unconstitutional.

Cities and municipalities are expressly exempted from the operation of the public utilities act in respect to the operation of light and water systems and are authorized to engage generally therein if their charters permit. The charter of the City of McMinnville does not so permit, and we have confined the city's activities to the terms of its charter, McMinnville and its vicinity, which latter terms we attempted to define.

The case of *Richards* v. *City of Portland,* 121 Or. 340 (255 Pac. 326) when considered in connection with the charter of that city, and the question before the court, does not conflict with our opinion in this case. The charter of Portland does not authorize the city to furnish water to anybody outside of the city limits, nor was the city claiming such right. It has as a matter of favor and convenience to outside villages furnished them water from its surplus, and

when that surplus became reduced, had declined, substantially, to continue to furnish it at the expense of a dearth of water within the city limits, and the suit was brought to compel it to *continue* to furnish such water irrespective of the needs of its own citizens. The court held that it was not compelled to furnish the water and all expressions in the opinion in that case must be construed with reference to the issue there being tried. When, if ever, a case is presented wherein a resident outside of McMinnville is attempting to *compel* the city to furnish him light or power, or to continue furnishing light or power theretofore being furnished, we will have a case in some respects parallel to *Richards* v. *City of Portland, supra*, but so far as the present case is concerned it is inapplicable.

Every phase in the present case, commented on by the petition for rehearing, has been carefully considered already and nothing would be gained by a re-argument. The city was within its technical legal rights and its action is neither a violation of the state or United States Constitution.

The petition for a rehearing is denied.

REHEARING DENIED.

BELT, J., concurs in result.