Argued and submitted June 9, 1983, reversed and remanded March 20, petition for
rehearing denied May 1, 1984

DeFAZIO et al,
*Plaintiffs-Respondents/*
*Cross-Appellants,*
CITY OF DRAIN et al,
*Plaintiffs-Respondents,*

*v.*

WASHINGTON PUBLIC POWER
SUPPLY SYSTEM (WPPSS) et al,
*Defendants-Appellants/*
*Cross-Respondents,*
NORTHERN WASCO PEOPLE'S
UTILITY DISTRICT et al,
*Defendants-Respondents.*

(TC 16-81-11344; CA A26721; SC 29649)

679 P2d 1316

James H. Clarke, Portland and Bruce Smith, Eugene, argued the cause and submitted brief for Defendant-Appellant/Cross-Respondent Washington Public Power Supply System. With them on the brief were Frank Gibson and Cass, Scott, Woods & Smith, Eugene; David H. Wilson, Jr. and Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland; Richard C. Yarmuth and Culp, Dwyer, Guterson & Grader, Seattle.

Garry P. McMurry, Portland, argued the cause and submitted brief for Defendants-Appellants/Cross-Respondents Cities of Springfield, Milton-Freewater and McMinnville. With him on the brief were Peter A. Mersereau, James A. Fitzhenry and Rankin, McMurry, VavRosky & Doherty, Portland; Douglas E. Hojem and Corey, Byler & Rew, Pendleton; David C. Haugeberg, Gary A. Rueter and Haugeberg & Rueter, McMinnville.

Robert L. Ackerman, Springfield, argued the cause and filed brief for Plaintiffs-Respondents/Cross-Appellants Springfield Ratepayers. With him on the brief were Ackerman, DeWenter & Huntsberger, Springfield, and Lawrence D. Salmony, Certified Law Student, Springfield.

Martha L. Walters, of Johnson, Harrang & Swanson, Eugene, argued the cause for Plaintiffs-Respondents City of Drain, Drain Ratepayers and City of Bandon. With her on supplemental briefs were John H. Hammond, Jr., Oregon City, representing Plaintiff-Respondent Canby Utility Board and Wilford K. Carey, Jr., Hood River, representing Plaintiff-Respondent City of Cascade Locks.

John R. Faust, Jr., Portland, argued the cause and filed brief for Defendants-Respondents Central Lincoln People's Utility District and Clatskanie People's Utility District. With him on the brief were Donald A. Haagensen, Mildred J.

Carmack and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland. With him on memorandum of additional authority was George P. Winslow, Jr., Tillamook, representing Defendant-Respondent Tillamook People's Utility District. With him on additional authorities was Stanley D. Heisler, The Dalles, representing Defendant-Respondent Northern Wasco People's Utility District.

Willard L. Cushing, McMinnville, argued the cause and filed brief for Plaintiffs-Respondents/Cross-Appellants City of McMinnville Ratepayers. With him on the brief was Cushing, Johnstone & Peterson, P.C.

LINDE, J.

Lent, Linde and Roberts, JJ., filed a concurring opinion.

Peterson, C. J., filed a concurring opinion.

## LINDE, J.

In 1976, the Washington Public Power Supply System and 88 governmental and cooperative entities in six states entered into a set of agreements under which the system, hereafter designated WPPSS, would construct and operate two nuclear-powered generating plants, Washington Nuclear Projects (WNP) 4 and 5, and the participating entities, referred to as the "participants," would be entitled to fractions of the power generating potential of these plants in return for specified financial obligations. The present litigation concerns the question whether various Oregon participants could legally commit themselves to the terms of these agreements. Upon suit brought in 1981 by ratepayers of the City of Springfield, one of the participants, later joined by a number of other private and municipal plaintiffs, the circuit court rendered a judgment declaring the Participants' Agreements executed by seven cities and four People's Utility Districts to be *"ultra vires,* void and invalid." Defendants appealed, and we accepted certification of the appeal by the Court of Appeals to this court pursuant to ORS 19.210 and ORAP 17.05.

## I. THE PARTIES' POSITIONS

Because some of the issues are common to several parties and others are not, it is necessary to sort out the parties' positions in this action.

The action began with a complaint filed on December 22, 1981 by plaintiffs DeFazio, Dix, and Ratley, as consumers of electricity distributed by the Springfield Utility Board, an agency of the City of Springfield, against the City of Springfield and the Washington Public Power Supply System, alleging the invalidity of the city's agreement with WPPSS and seeking declaratory relief. During the months of March to May, 1982, motions to intervene were filed by the cities of Drain, Bandon, Cascade Locks, Milton-Freewater, McMinnville, and the Canby Utility Board, by ratepayers served by the cities of Drain and McMinnville, and by the Clatskanie, Central Lincoln, Tillamook and Northern Wasco People's Utility Districts (PUDs). The circuit court allowed these motions on May 26, 1982, and the parties filed an amended consolidated complaint on July 13, 1982.

Although the procedure placed among the defendants some who deny the validity of the agreement, specifically the PUDs, no question is raised about this procedure. Rather than refer to the parties as plaintiffs and defendants, we ordinarily shall refer to WPPSS as the main proponent of the Participants' Agreements, joined in part by the cities of Springfield, McMinnville, and Milton-Freewater, and to the opponents respectively as the ratepayers, the cities, and the districts or PUDs.

The ratepayers and some of the cities contend that they lack charter authority to enter into the agreements and that special statutory procedures were the exclusive means for joining with others in financing generating facilities. They also contend that by promising unconditionally to pay a share of the project costs whether or not they received any electricity in return the cities incurred debts that may only be incurred by charter amendments or other consent of their qualified voters, and that they unconstitutionally invested in or lent their credit to WPPSS. Finally, they attack the agreements as unlawfully delegating the authority of city officials over electric rates by committing future rates to cover whatever payments would be required under the agreements.

The cities of Springfield, Milton-Freewater, and McMinnville deny these contentions. Among other arguments they maintain that the Participants' Agreements imposed no obligation on the participants to pay for construction costs, or debt service on such costs, if the projects were terminated before commencing operation, as WNP 4 and 5 in fact were. The actual legal consequences of the termination are not before us in this litigation, because the plaintiffs sued for a declaration that the Participants' Agreements were unlawful when they were made.

The PUDs argue that the obligations assumed in the Participants' Agreements constituted long-term indebtedness of the PUDs equivalent to revenue bonds and could be accomplished only with approval by the PUDs' qualified voters. Like the other opponents, the PUDs contend that they could join with others in financing the projects only under statutes that were not followed, that they lacked authority to guarantee the debts of other entities such as WPPSS, that the agreements were an unconstitutional investment or lending of

credit, and that the agreements unlawfully delegated their authority over their operations and electric rates. They also claim that the agreements were void as being against the public policies represented by these legal restrictions.

The proponents reject all attacks on the transactions, maintaining that the agreements were purchase contracts within the ordinary legal authority of the cities and PUDs. They contend in turn that plaintiffs' claims should have been dismissed as barred by laches or by estoppel.

The logical sequence is to take up, first, a challenge to the timing of the plaintiffs' action; then issues of the cities' and districts' authority, then limitations on that authority found in their charters or in statutes, and finally constitutional limitations. In this instance, issues common to all parties will precede some arguments that depend on separate provisions governing different participants. Because the court is in disagreement on the analysis of the timing issue, that discussion appears at the end of the opinion.

Each of the substantive positions has been exhaustively briefed and argued with great ability and, taken individually, with much persuasive force. The briefs and supplements total 1,513 pages without conspicuous waste, and an opinion responding to each argument in detail would threaten to become nearly as long.

The major arguments, however, have a common theme. There is no important disagreement about the facts. There is substantial agreement about much of the governing law. Some contentions do not require extensive discussion. For these reasons we shall not discuss all the decisions and other informative sources that have been cited. The major arguments hinge on characterizing the agreements by which the participants undertook to reimburse WPPSS from their power revenues for the costs of financing, building, and operating two nuclear power plants in return for a share of whatever electric power, if any, those plants would deliver to the region's distribution grid.

The proponents contend that the agreements are what they purport to be: contracts to assure the participating utilities of a share of future thermal power generation that WPPSS would undertake to produce, contracts executed with

the recognition that the undertaking might fail but that it could not be attempted unless the contracts covered the costs of an unsuccessful attempt. The opponents describe the agreements as an attempt to disguise substance by form, a poorly camouflaged effort to obtain revenue financing of the proposed plants by the participants while circumventing the voting procedures and debt limitations by which statutes, charters, and constitutions seek to guard against such fiscal folly. The proponents insist that it is perfectly proper to structure transactions within legally available forms and that these forms must remain reliable under the stress of failure.

Certainly these transactions were designed and piloted on their way with every effort to stay in an apparently open channel among the legal shoals; they had to be, to reach the financial markets. But the opponents contend that the design, whether born of excess optimism or of desperation, actually sank at its launching.

For the reasons that follow we hold that the local officials who entered into the challenged agreements in 1976 had legal authority to do so, and that in doing so they did not violate constitutional or other legal prohibitions. We therefore reverse the circuit court. This proceeding involves no question of the legal consequences and present enforceability of the agreements in the light of developments after the agreements were executed, and we express no view thereon.

## II. THE PARTICIPANTS' AGREEMENTS

The Washington Public Power Supply System, organized in 1957, is a municipal corporation and a "joint operating agency" under Washington law. RCW 43.52. It is an association of 19 Washington public utility districts and four Washington cities. Its role in financing facilities to generate power for distribution by nonmembers grew from the search by the federal Bonneville Power Administration and the region's utilities, through such planning groups as the Public Power Council and the Pacific Northwest Utilities Conference Committee, for ways to meet the region's expected future power needs by means other than the federal appropriations that built most of the large hydroelectric projects from the 1930s to the 1950s.

Under one such arrangement, WPPSS financed and owns the region's first major thermal generating plant, a nuclear reactor at Hanford, Washington, that was authorized by Congress in 1960 and completed in 1966. The projected output of the Hanford reactor was integrated into the Bonneville system by assuring participating utilities of firm power from BPA in return for their shares of the Hanford output, whether or not the Hanford project in fact produced any power. BPA promoted the construction of additional generating plants in various ways. One of these was the device of "net billing," by which utilities financing the plants would assign their share of the generating capacity to BPA in exchange for credits on hydroelectric power purchases from BPA. Because this arrangement assured that the utility would receive BPA power to the amount of payments so credited, BPA in effect assumed the risk that the generating capacity assigned to it would fall below expectations. This device was used for the Trojan nuclear power plant at Rainier, Oregon, and for three earlier WPPSS plants, Washington Nuclear Projects (WNP) 1, 2, and 3. BPA withdrew the "net billing" device for the two projects, WNP 4 and 5, that are involved in the present litigation. BPA nevertheless encouraged its "public power preference" customers to go forward with WNP 4 and 5, predicting a deficiency in federally generated power for their needs, but BPA did not offer protection against the possible failure of these projects corresponding to the earlier arrangements.[1]

In order to finance projects WNP 4 and 5, WPPSS executed five sets of contracts. Those relevant to the present issues are the Participants' Agreements and a bond resolution for the sale of bonds to investors which is incorporated in the Participants' Agreements. There also is an agreement for assigning to WPPSS for resale any power that a participant might not use, an agreement for acquisition by Pacific Power and Light Company of a 10 percent undivided ownership

---

[1] This background is set out in greater detail in several sources. *See* Hittle, et al., *Pacific Northwest Power Generation, Multi-Purpose Use of the Columbia River, and Regional Energy Legislation: An Overview,* 10 Env L 235, 245-250, 262-274 (1980); Foote, Larsen and Maddox, *Bonneville Power Administration: Northwest Power Broker,* 6 Env L 831, 839-852 (1976); *Natural Resources Defense Council v. Hodel,* 435 F Supp 590 (1977); *Chemical Bank v. Wash. Pub. Power Sup. System,* 99 Wash2d 772, 666 P2d 329 (1983); *Asson v. City of Burley,* 105 Idaho 432, 670 P2d 839 (1983).

share in project 5, and an agreement for short term sales of power to certain industries.

A number of the disputed issues depend on how the Participants' Agreements are characterized.

The agreements themselves are written as contracts for the sale of shares of "project capability," a phrase which in turn is defined to mean "amounts of electric power and energy, if any, which the Projects are capable of generating at any particular time." Under the terms of the Participants' Agreements, WPPSS undertook the financing, design, construction, operation, maintenance, and eventual termination of the power plants, to issue and service bonds for that purpose, and to deliver power from the plants to the federal transmission grid for the account of each participant. The participants, in turn, promised to pay proportionate shares of the costs of constructing, operating, and terminating the two projects, whether or not they received any power from them. Each agreement went into effect only when agreements allocating 100 percent of the projects' capability and costs were executed. An "Official Statement" issued by WPPSS in marketing its bonds summarized the agreement as follows:

> "Each Participant is obligated to pay the Supply System its share of the total annual cost of the Projects, including debt services on the Bonds . . . whether or not the Projects are operable or operating and notwithstanding the suspension, reduction or curtailment of the Projects' output."

Certain other provisions of the Participants' Agreements are important. Participants undertook to make payments only from electric utility revenues; in turn, each promised to maintain electric rates high enough to cover its payments to WPPSS along with its other obligations.[2] A participant's

---

[2] Section 6(c):

"No Participant which is a statutory preference customer of Bonneville shall be required to make any payments to Supply System under this Agreement except from the revenues derived by such Participant from the ownership and operation of its electric utility properties. Such Participant covenants and agrees that it will establish, maintain and collect rates or charges for power and energy and other services, facilities and commodities sold, furnished or supplied by it through any of its electric utility properties which shall be adequate to provide revenues sufficient to enable the Participant to make the payments to be made by it to Supply System under this Agreement and to pay all other charges and obligations payable from or constituting a charge and lien upon such revenues."

share could increase as much as 25 percent if another participant of the same type were to default. This step-up clause was designed to cover possible gaps in financing.[3] The agreements provide for election of a Participants' Committee with powers to review proposals of WPPSS on specified subjects and, in case of disapproval, to submit the matter to a Project Consultant.

By its Bond Resolution 890, WPPSS authorized issuance of revenue bonds to finance the construction of WNP 4 and 5. The resolution covenanted that WPPSS would collect revenues from charges for power, "including capability," sufficient to service the bonds and that it would not rescind or amend the participants' obligations or payments. Chemical Bank was named as the bond fund trustee and empowered to enforce the agreements. A provision of the Participants' Agreement, in turn, "recognized" that WPPSS was bound to comply with the Bond Resolution, among other regulatory and contractual obligations, and provided that "this Agreement is made . . . subject to the terms and provisions of . . . the Bond Resolution" and regulatory requirements.

In short, the transactions were designed so that WPPSS could raise the capital needed to build two nuclear power plants by assuring that 100 percent of the costs would be recovered through irrevocable contracts with distributing utilities, which agreed to maintain their own rates high enough to meet those costs but were not obliged to meet them from any other source of funds.

At the time of this litigation, WPPSS had terminated the projects after raising and spending several billion dollars toward their construction, when accumulating costs and marketability of power at the resulting prices proved vastly

---

[3] Section 17(c):

"If the Participant is a municipal corporation, upon default on the part of any other such Participant(s) which is a municipal corporation the Participant's Share shall be automatically increased for the remaining term of this Agreement pro rata with that of other such nondefaulting Participant(s) to the extent that such defaulting Participant(s) fails or refuses for any reason to perform its obligations under its Participants' Agreement, and the Participant's Share of such defaulting Participant(s) shall be reduced correspondingly; *provided,* that the sum of all such increases for the Participant pursuant to this Subsection shall not exceed, without consent of the Participant, an accumulated maximum of 25% of the Participant's Share."

different from the initial assumptions. These events, however, do not bear on the issues before the court, apart from illustrating the risk that was present from the beginning.

The question whether the cities and PUDs had authority to enter the transaction will not be judged by hindsight. That question is important beyond this case and will remain important for the future ability of the cities and districts to serve their communities, unless their authority is changed by law. It will not be decided with a view to the fate of WPPSS projects and its consequences. The answer must be the same as if the project still promised to deliver power at reasonable cost, and the cities and PUDs were defending their participation against a challenge, for instance, by opponents of nuclear power seeking to attack the legal basis for the projects.

### III. NONCOMPLIANCE WITH STATUTES

On two occasions, the Legislative Assembly responded to the concern of cities and PUDs by providing new statutes under which these public entities might join others in securing the thermal generating capacity that federal agencies could not provide. It enacted the Thermal Power Facilities Act (TPFA), Or Laws 1967 ch 603, and the Joint Operating Agency Act, Or Laws 1973 ch 722. The cities and PUDs did not use either of these statutes in their agreements to purchase "power capability."[4] The parties dispute whether failure to follow these statutes is fatal to the agreements, either because there is no other authority to participate in the kind of projects undertaken here, or because the specific statutory provisions displace whatever authority otherwise might exist.

The Thermal Power Facilities Act, codified with respect to cities in ORS 225.450 - 225.490 and with respect to PUDs in ORS 261.235 - 261.255, declared it to be in the public interest that cities, districts, electric cooperatives, and electric utility companies "participate as authorized in [the act]" to achieve economies of scale and to meet future power needs. ORS 225.460, ORS 261.240. The same sections direct that the act be "construed liberally" to effectuate those purposes. The

---

[4] The cities also did not make use of the authority given cities in ORS 225.060 "either severally or in joint agreement [to] purchase, own, operate and maintain any works in an adjoining state necessary or pertinent to the furnishing of electric power . . . ."

act provides that "[i]n addition to the powers otherwise conferred" on cities and on districts respectively, each "may plan, finance, construct, acquire, operate, own and maintain an undivided interest in common facilities" jointly with other utilities or any combination thereof, "and may make such plans and enter into such contracts and agreements as are necessary or appropriate for such joint planning, financing, construction, acquisition, ownership or maintenance." ORS 225.470, ORS 261.245. When proceeding under the act, each city or district "shall be liable only for its own acts," and no money contributed by it may be credited to another participant. ORS 225.480, ORS 261.250. Each may "furnish money and provide property" and sell revenue bonds "pledging revenues of its electric system and its interest or share of the revenues derived from the common facilities . . . in order to pay its respective share of the cost" thereof. ORS 225.490, ORS 261.255.

 The opponents point to enactment of this statute to show that prior to 1967 the cities and PUDs lacked authority to join with others in combined transactions of the kind before us. The testimony they quote from the legislative history shows that some witnesses doubted that such authority existed, and legislators may have shared those doubts. But that cannot be used to show what the prior state of the law actually was. The views legislators have of existing law may shed light on a new enactment, but it is of no weight in interpreting a law enacted by their predecessors. Moreover, witnesses and legislators alike would know that legal doubts alone could prove fatal to successful participation in any financing plan, however lawful it actually might be. It is perfectly sensible to meet such doubts by providing the desired statutory authority, whatever the prior authority might cover. TPFA's use of parallel provisions for the cities and the districts further demonstrates that the purpose was to provide each with assured authorization "[i]n addition to the powers otherwise conferred," for these powers are not otherwise identical.

The 1967 act shows that the legislators wanted Oregon cities and PUDs to be able to join with others in planning, financing, building, operating, and owning common facilities, and that they wanted this authority to be "construed liberally." ORS 225.460, ORS 261.240. The act also shows that

they wanted each city and district to be liable only for its own share, and that if it needed to issue revenue bonds, this would require the normal procedures prescribed in the city charter, ORS 225.490, and the PUD statutes, ORS 261.255, 261.355. Except for these constraints, the language of the TPFA is the language of authorization, not of limitation. We do not read the stated public policy that the cities and districts "participate as authorized" in the act to mean "only as authorized" therein. We are not persuaded that the TPFA was meant to supersede other powers available to cities or PUDs.

The second statute, the Joint Operating Agency Act, enacted in 1973, is codified in ORS 262.005 - 262.115. It authorizes three or more Oregon cities or PUDs to form a "joint operating agency to plan, acquire, construct, own, operate and otherwise promote the development of utility properties in this state for the generation and transmission of electric power and energy," and to join with other entities for that purpose, and it authorizes such a joint operating agency to participate in joint ownership of thermal plants in accordance with the TPFA. ORS 262.015. Given the TPFA, this second act clearly is supplemental, not exclusive, authority. The only claim made for it is that, along with the TPFA, it represents a legislative "offer" of otherwise nonexistent "extramural" authority to the municipalities, an issue dealt with later in this opinion.

■ We conclude that if the cities and PUDs otherwise had authority to enter the agreements challenged in this litigation, enactment of the two statutes did not supersede that authority or restrict it, except for the policy against financing another participant's share that is expressed in ORS 225.480 and ORS 261.245.

## IV. APPLICABILITY OF BOND PROCEDURES

The opponents attack the Participants' Agreements for failing to comply with provisions in charters, statutes, and the constitution that impose procedural rules and substantive limits on incurring public debts. Some of these rules relate specifically to the issuance of bonds.

If the PUDs or the cities themselves had issued revenue bonds, they would have had to obtain the approval of their respective voters, the PUDs by virtue of ORS 261.305(6),

ORS 261.355 and ORS 261.375(1), the cities by virtue of charter provisions. Of course, the PUDs and cities did not issue bonds, WPPSS did. The opponents argue, however, that the obligations incurred in executing the Participants' Agreements were the equivalent of revenue bonds and therefore required voter approval. The argument is stated in several ways. The participants' payments to WPPSS retire a debt incurred by WPPSS on their behalf which they have the sole responsibility to repay; therefore the participants must "treat this bonded obligation as their own." Construction of the projects by WPPSS on the strength of the participants' unconditional obligations to pay the costs was a "scheme" or "artifice" designed to circumvent voting requirements and other legal constraints. WPPSS, the opponents say, is only a "conduit" between the participants and the bondholders.

These descriptions do not make entirely clear whether the argument is that the participants are the true debtors of the bondholders and the bonds issued by WPPSS are really their bonds, or rather that the Participants' Agreements, by "pledging" future power revenues to pay all costs incurred by WPPSS, themselves constitute "bonds" issued to WPPSS. The opponents do not claim that either statement is literally true. The participants did not incur direct debts to the holders of WPPSS bonds, though their unconditional promises to pay the total costs of WNP 4 and 5 were the only source from which WPPSS would pay those bonds. Likewise, the participants borrowed no money from WPPSS that they promised to return with interest; what they expected to get for their future payments was electric power, expressed as a share in the generating capability of the projects. But the opponents claim that in substance, if not in form, the transactions were the same as issues of revenue bonds by the PUDs and cities themselves.

To support their claim that the court should look through the legal form to the economic substance of the transaction, the opponents rely on *Martin v. Oregon Building Authority,* 276 Or 135, 554 P2d 126 (1976). That case arose upon special statutory review of the constitutionality of an act creating a building authority as a means to buy or construct buildings with revenue bond financing for lease to state agencies, and the court invalidated the act as an attempt to "create any debt or liability" exceeding $50,000 in a manner

forbidden by Article XI, section 7, of the constitution. To show how the court reached that conclusion, we review the case in some detail.

The law at issue in *Martin* created the Oregon Building Authority as an "independent public body politic and corporate" for the purpose of developing "necessary facilities" for the state at an advantageous cost. The building authority's board of directors was composed of the State Treasurer, the Attorney General, and the Director of the Department of General Services. The building authority was empowered to finance the acquisition of buildings for lease or sale to state agencies by issuing notes and bonds which were to be payable solely from the building authority's revenues or other assets and expressly were not to be a "debt or liability of the state." Revenues obtained from leasing or selling buildings to the state would be pledged as security for payment of the bonds and channeled through a trust fund administered by an independent trustee. At the time of the litigation, the board of directors had adopted resolutions for the issuance of bonds to finance seven projects, including the construction of new wings for the capitol. Each was to be leased to the state under leases which fixed the rent at the amount of debt service on the bonds plus the building authority's operating expenses. The court found that the state's obligation to pay rent was unconditional and "supported by the state's full faith and credit." 276 Or at 138-139. The rentals were assigned to the trustee or trustees for the benefit of the bondholders.

Justice Holman's opinion for the court began by reviewing the origins of constitutional debt limitations in the 19th century in response to excessive government borrowing, primarily for transportation facilities, which often led to defaults. The opinion then stated:

> "It is generally agreed that in imposing debt limitations, 'the predominant purpose was the achievement of a high degree of control over debt creation in order to forestall irresponsibly imposed tax burdens * * *.' The Oregon cases have stated that our provision 'was adopted by the people as a protection against burdensome and excessive taxation' and that it was intended 'to prevent exposing the sources of public revenue to potential hazard.' Long-term obligations create a fixed charge against future revenues and can impair the flexibility of planning and the ability of future legislatures to

avoid a tax increase. Debt restrictions force the elected representatives of the people to operate the government within its means and remove the temptation to undertake projects on an enjoy-now, pay-later basis."

276 Or at 141 (footnotes omitted). The opinion observed that building authorities were a controversial device to skirt debt limitations, though they had been upheld in a majority of cases in other states. To sustain the Oregon Building Authority would depend on finding that neither the authority's bonds nor the state's leases were debts within the constitutional prohibition.

The court noted that the bonds might escape the prohibition if the issuer were truly independent of the state, or if they were revenue bonds even if the issuer was considered a state agency. The revenue which was pledged to support these bonds, however, was future government rents payable from funds raised by taxation. As to independence from the state, the court thought the status of the building authority comparable to that of the university regents in *McClain v. Regents of the University,* 124 Or 629, 265 P 412 (1928), whose dormitory construction bonds had escaped the debt limitation only because they were revenue bonds. The building authority, the court noted, "is managed and controlled by state officers, it must report periodically to the Governor and must obtain legislative approval for certain of its actions, and it is maintained largely by public funds. Its sole purpose is to implement the building policies of the state." The main difference from the university regents was the legislature's description of the authority as an "independent body." 276 Or at 144.

The court concluded that when the transactions were viewed as a whole, the separate existence of the building authority must be disregarded. It reached this conclusion in essence because the building authority had no purpose other than to borrow money, because its income was assigned to trustees, because the state was its only possible tenant, because the authority had no other use for the structures it financed, and because the leases delegated responsibility for handling construction of the authority's projects to the state. 276 Or at 144-145, 147.[5] The court therefore described the

---

[5] The issue of financing state buildings by long-term leases in *Martin* was complicated by the fact that Or Const Art XI, § 7 was amended in 1964 to except such

building authority as a "gutless intermediary" whose sole function was to insulate the actual relationship between the bondholders and the state from the constitutional debt limitation, and it summarized its holding to be "that for constitutional purposes we are going to look through the dummy corporation and that the bonds are the debts of the state." 276 Or at 145, 147.

Although the issue presently under discussion is not debt limitation but voting requirements, the opponents of the Participants' Agreements argue that the similarities of the financing arrangements in this case to those in *Martin* equally require us to disregard the separate existence of WPPSS and to treat the bonds issued by WPPSS as the participants' bonds. The economic similarities are great. In both cases, unconditional commitments of governmental customers to pay for future services were used by bond issuers to finance facilities for the exclusive benefit of those customers; the amount of future payments was tied to the costs of financing the projects; and those payments were the only source of repayment for financing the acquisition, construction, and operation of the projects. In both cases, also, the transactions were designed to avoid borrowing by the governmental users by having a supplier rather than the user borrow the needed funds on the strength of long-term user agreements covering the entire cost of the projects.

The differences between the Oregon Building Authority and WPPSS are equally obvious. The building authority was created by the state government solely as an instrumentality to finance its own need for buildings. It was directed by a board composed of the chief legal, financial and property management officials of the state government. Whatever the building authority act meant by the phrase "independent public body politic and corporate," such a board could no more be a "body politic" divorced from state government than, for instance, the State Land Board composed of the Governor, Treasurer and Secretary of State.[6] WPPSS is

---

leases from the debt limitation. The court, and Justice O'Connell, concurring, found the exception inapplicable because the lease payments to the building authority were pegged to recovery of costs, not to fair rental value. 276 Or at 150-158.

[6] *See* Or Const Art VIII, § 5; ORS 273.031.

not a creation of the Oregon participants in WNP 4 and 5, or of all the 88 participants in those projects; as stated above, it was organized under Washington law in 1957 as a statutory municipal corporation and joint operating agency of 19 Washington public utility districts and three Washington cities. WPPSS is not "managed and controlled" by officers of the government with which it contracted, as the *Martin* court observed of the building authority. Moreover, WPPSS did not, like the building authority, delegate to the user agencies the responsibility for construction of the projects it would finance for them.

Again, it must be remembered that the present discussion does not concern the question whether the Oregon participants incurred "debts," but whether the participants are the actual — and unauthorized — issuers of the bonds sold to finance WNP 4 and 5 because the separate existence and role of WPPSS should be disregarded like that of the building authority in *Martin.* On this question the economic similarity of the financing devices is not decisive. The commitment of an agency's long-term contract as security, even as the sole security, for financing a building, a power plant, or another source of supply dedicated to the agency's use does not turn WPPSS or any otherwise independent supplier into a "dummy corporation" of the contracting agency. WPPSS was used as the vehicle for building thermal generating projects for the participants precisely because it already had an independent existence and bonding capacity. The *Martin* decision does not support a holding that would disregard this independent existence of WPPSS as the issuer of its bonds.

## V. DEBT LIMITATIONS

The Participants' Agreements obligate each participant to make its contractual payments to WPPSS whether or not the projects are completed and whether or not they produce electric power. These payments, however, are to be made only from the participant's revenues derived from the operation of its electric utility properties.[7] The parties dispute

---

[7] In addition to section 6(c), footnote 2, *supra,* section 6(d) provides:

"The Participant shall make the payments to be made to Supply System under this Agreement whether or not any of the Projects are completed, operable or operating and notwithstanding the suspension, interruption, interference, reduction or curtailment of the output of either Project for any reason whatsoever in whole or in part. Such payments shall not be subject to any reduction, whether

whether the obligations are debts or indebtedness, as those terms are used in the various laws applicable to such debts, or escape these laws because they are payable only from electric power revenues. The arguments concerning the cities differ from those concerning the PUDs, and we deal with each separately.

The issue whether the cities' unconditional commitments to WPPSS constitute debts arises under the individual city charters. When cities were incorporated by individual legislative acts, Article XI, section 5 of the Oregon Constitution required such acts incorporating cities to "restrict their powers of taxation, borrowing money, contracting debts, and loaning their credit." One city, Springfield, still has a statutory charter; the others adopted their own charters after Article XI, section 2, shifted that function from the legislature to the cities themselves.[8] Each has a debt limitation in its charter, but they are not identical.[9]

---

by offset or otherwise, and shall not be conditioned upon the performance or nonperformance by Supply System or any other Participant or entity under this or any other agreement or instrument, the remedy for any non-performance being limited to mandamus, specific performance or other legal or equitable remedy."

[8] One statute relating to municipal bond issues, ORS 287.004, generally limits a city's outstanding bonds to three percent of its property tax base but excepts bonds issued for "power" purposes (presumably electric power) among others. The same section expressly requires voter approval for city bond issues only when required by the city charter or by another statute.

[9] Springfield Charter, Art VII, § 54:

"The common council of said city shall not in any way create any debts or liabilities which shall singly or in the aggregate exceed the sum of $500.00, except as in this charter otherwise specifically provided."

McMinnville Charter, ch XI, sec 64:

"Except by consent of the voters, the city's voluntary floating indebtedness shall not exceed $100,000.00 at any one time. . . ."

Milton-Freewater Charter, ch X, sec 2:

"Except by the consent of the voters the voluntary floating or warranted indebtedness of the city for general purposes shall not exceed $25,000.00 at any one time provided, that the legally authorized debt of the municipalities of Milton or Freewater existent at the time of the adoption of this Charter shall not be included in such indebtedness for purposes of calculating the limitation."

Drain Charter, ch XII, sec 1:

"Except by consent of the voters, the city's voluntary floating indebtedness shall not exceed $25,000.00; not its bonded indebtedness $250,000.00 at any one time. Bonded indebtedness to be by amendment to charter. . . ."

Canby Charter, ch XII, sec 1:

"Except for bonds heretofore or hereafter authorized, the City's voluntary floating indebtedness shall not exceed $25,000.00. For the purposes of calculating

■ It should be understood that the meaning of a charter debt limitation, as the meaning of any other charter provision, is an individual matter for each city. The adoption of a debt limitation, by charter or otherwise, is local legislation, to be interpreted by the same means as other legislation, including attention to the meaning intended by those who adopted it if that can be ascertained. It is not a matter of common law, to be resolved by consulting caselaw or encyclopedic summaries of caselaw. *Cf. Anderson v. Peden,* 284 Or 313, 315-316, 587

---

the limitation, however, the legally authorized debt of the City in existence at the time this Charter takes effect shall not be considered, and all bonds of the City heretofore issued and unpaid at the time this Charter takes effect shall remain and continue to be the obligation of the City of Canby until the same are paid. . . ."

Cascade Locks Charter, ch X, sec 40:

"Except by consent of the voters, the city's voluntary floating indebtedness shall not exceed $2,500.00; nor its bonded indebtedness, $5,000.00 at any one time. . . ."

Bandon Charter, Art IX, sec 34 (1940):

"Unless otherwise authorized by the legal voters of the City of Bandon at a special election duly called and held for such purpose, the council shall not contract a voluntary floating indebtedness of said city in excess of the sum of $500.00 for general city purposes and the council shall not contract an indebtedness in excess of the sum of $1,500.00 for the maintenance and operation of its municipal utilities; no warrants shall be authorized by the council, nor be issued unless there is cash in the city treasury available for the payment of such warrant.

"Members of the city council, or any other city official or public employee, who shall authorize, incur, cause or create, or officially approve any such indebtedness in excess of said limitation, shall be jointly and severally liable, individually and personally, for the amount of such excess."

(This section was removed when the City of Bandon amended its charter in 1981.)

The charters of the cities of Drain, McMinnville, Cascade Locks and Canby also state:

"All city officials and employees who create or officially approve any indebtedness in excess of this limitation shall be jointly and severally liable for the excess."

Charters of the cities of Drain and Cascade Locks also provide:

"For purposes of calculating the limitation, however, the legally authorized debt of the city at the time this charter takes effect shall not be considered."

The McMinnville Charter contains the same provision, without the language "at the time this charter takes effect."

Under the Canby and McMinnville charters, the ordinary charter debt limitations do not apply, respectively, to revenue bonds of the Canby Utility Board and to warrants of McMinnville Water and Light Commission. Instead, the Canby Utility Board's authority to "borrow money" for up to five years is limited to a stated percentage of revenue or plant value, Canby Charter ch XIII, § 4(1). Similarly, the Springfield Utility Board's power "to borrow money either by the issuance of notes or bonds secured only by a pledge of [utility] revenues" is limited to 25 percent of the utility's original cost and to stated purposes. By their terms these provisions do not apply here, once the argument that the participants are the "borrowers" under bonds issued by WPPSS is rejected.

P2d 59 (1978) (concerning the meaning of "conditional use" in zoning ordinances). A city can write its charter or ordinance to define for itself the amount, character, or purposes of indebtedness that it means to limit. Not only can cities choose different words; legislative history may show that cities, like state legislatures, meant different things by the same words.

■ It therefore is not conclusive that cases have held indebtedness under various charter provisions to include long-term contracts or to exclude obligations payable from "special funds." In the absence of statute, a city can design its debt limitation to exclude payments due for goods and services as distinct from borrowed money, or to include debts payable from non-tax revenues.[10] Under the "home rule" powers of Article XI, section 2 of the Oregon Constitution, these are political choices for the cities; they will not be imposed by courts in the name of judicial doctrines.

This does not mean that past judicial opinions are irrelevant in interpreting a particular provision. Given the ingrained tendency to copy conventional texts, though obscure, rather than seek clarity by new ones, charter debt limitations may well have been adopted and later repeated in the belief that they meant whatever courts or McQuillin had said of such provisions generally.[11] As early as 1873, for instance, this court held that a 17-year contract to purchase water at a fixed rate created an immediate indebtedness for the total, aggregate purchase price. *Salem Water Co. v. City of Salem*, 5 Or 29 (1873), *see also Brewster v. Deschutes County*, 137 Or 100, 1 P2d 607 (1931). The assumption that present charter provisions accept that interpretation of indebtedness might be overcome by showing a different intention, but no such showing has been attempted in this case. WPPSS invites us to reconsider this "aggregation rule," citing a reference to that possibility in *Terry v. Multnomah County*, 279 Or 127, 136, 138, 566 P2d 878 (1977). But, as already stated, that view of long-term contracts is not properly a judicial rule but judicial interpretation of state or local laws, and it can be modified at will by amending the laws.

[10] *See* ORS 287,004, *supra* n. 8.

[11] See 5 McQuillin § 2232 (1913, 1st ed) stating that long-term contracts are debt and 5 McQuillin § 2228 (1913, 1st ed) (payments from "special funds" are not debt).

For present purposes we accept the opponents' assertion that the cities' financial commitments to WPPSS would qualify as indebtedness within these cities' respective charters if they were payable from general funds. The question is whether the charter limitations exclude debts payable only from electric utility revenues under the interpretation of debt limitations generally known as the "special fund doctrine."

We note that this "doctrine," too, is not a judicial rule of law but judicial interpretation of provisions found in various statutes, charters, and the constitution. Again, however, it is an interpretation that early was recognized in Oregon, *see, e.g., Brockway v. Roseburg,* 46 Or 77, 79 P 335 (1905), *Eaton v. Mimnaugh,* 43 Or 465, 73 P 754 (1903), *Avery v. Job,* 25 Or 512, 36 P 293 (1894), and we are offered no evidence that any of the provisions relied upon in this case were differently intended or in practice have been thought to include debts payable from non-tax revenues.

The proponents rely on this court's statement of the doctrine in *Butler v. City of Ashland,* 113 Or 174, 232 P 655 (1925), which involved a city's contract to buy water from an irrigation district. The city expected to pay for the water by issuing notes exceeding the amount of debt allowed by its charter, and the contract originally was made contingent on approval of a charter amendment by the voters. When the city found that it could meet the cost from accumulated and expected revenues from the sale of water, the contract was changed to substitute "certificates of indebtedness" payable exclusively from those revenues, and no authorizing election was held. The court declined to enjoin issuance of the certificates of indebtedness as a violation of the charter. It wrote:

> "The authorities are well-nigh unanimous, that where a contract creating an indebtedness provides for a special fund with which to meet the indebtedness as the same accrues, and no general liability is thereby created against the municipality, such an indebtedness is not within the constitutional inhibition against creating a debt in excess of a fixed amount . . . ."[12]

---

[12] The court cited 5 McQuillin, Municipal Corporations, §§ 2227, 2228, and 2230, and the following cases as having approved the principles stated in those sections: *Morris v. City of Sheridan,* 86 Or 224, 233, 167 P 593 (1946); *Smith v. Jefferson,* 75 Or 179, 146 P 809 (1915); *City of Joseph v. Joseph Water Works Co.,* 57 Or 586, 111 P 864, 112 P 1083 (1910); *Kadderly v. Portland,* 44 Or 118, 151, 74 P 710, 75 P 222 (1903); *Little v. City of Portland,* 26 Or 235, 246, 37 P 911 (1894).

"The language of the special obligation note limits the liability of the city to the water revenues. The special obligation notes, therefore, do not constitute an indebtedness against the city within the meaning of Article XI, Section 5, of the Constitution of Oregon."

113 Or at 182-183.

Subsequent decisions have repeated this view of debt limitations, making their application turn on the potential exposure of general tax revenues. *Compare, e.g., Walsh Const. Co. v. Smith,* 272 Or 398, 404, 537 P2d 542 (1975) (housing bonds payable from rents held to be outside debt limitation despite a "moral make-up clause"); *Morris v. City of Salem,* 179 Or 666, 174 P2d 192 (1946) (same for contract to purchase parking meters payable only from meter revenues), *McClain v. Regents of the University, supra* (same for dormitory bonds payable only from rental income), with *Public Market Co. v. City of Portland,* 171 Or 522, 130 P2d 624, 138 P2d 916 (1943) (lack of revenue source to repay "utility certificates" would violate debt limitation ), *Rorick v. Dalles City,* 140 Or 342, 12 P2d 762 (1932) (held to be within debt limitation because of partial exposure of general funds beyond tolls collected from toll bridge).

■ We repeat that the exposure of tax revenues is not an inescapable definition of indebtedness. A public entity's financial obligations payable from its operating assets, like those in *Butler* or in the other cases cited above, may have all the ordinary characteristics of debt of a private entity engaged in a similar operation, and charters or other laws may choose how such debt should be incurred or restricted. The uniform interpretation given existing laws, however, is of long standing. The cities and their ratepayers do not claim that the special fund doctrine, as previously understood in Oregon, does not apply to their respective cities, but they claim that it does not apply to the obligations imposed by the Participants' Agreements.

They seek to distinguish the decisions applying the doctrine by arguing that none of those decisions involved obligations with all the features of the present agreements. They observe that the cities' financial obligations towards WPPSS are not for projects owned or controlled by the cities,

do not depend on actual receipt of any benefit (in this case electricity), are not self-liquidating, are not finite in amount or in the rates committed to paying them, and obligate revenues that are paid by substantially all residents for an essential service. They maintain that these characteristics should take the contracts beyond the limits of the "special fund" exception. The proponents respond that characteristics which individually do not create a debt under the charters also cannot cumulate so as to create a debt.

■ None of the listed characteristics places a transaction outside the "special fund" rule. This court's older decisions did not confine that concept to self-liquidating projects but used the term also to refer to assessments levied for specific projects that generated no revenue, such as a courthouse, *Dougan Co. v. Klamath County,* 99 Or 436, 193 P 645 (1920), a jail, *Wingate v. Clatsop County,* 71 Or 94, 142 P 561 (1914), and roads and streets, *Morris v. City of Sheridan,* 86 Or 224, 167 P 593 (1917), *Bowers v. Neil,* 64 Or 104, 128 P 433 (1912), *Kadderly v. Portland,* 44 Or 118, 74 P 710, 75 P 222 (1903), *Little v. City of Portland,* 26 Or 235, 246, 37 P 911 (1894). Also, the persons who provide the "special fund" need not be direct beneficiaries of the expenditure; indeed, there need not be any quid pro quo. In *Moses v. Meier,* 148 Or 185, 35 P2d 981 (1934), the court applied the doctrine to an unemployment relief fund payable from liquor control revenues. The opponents observe that *Moses v. Meier* was litigated as a "friendly" proceeding and perhaps turned on the court's desire to uphold the laudable purpose for which the liquor control funds were exacted in the first place. Nonetheless, the source of the funds, not the purpose to which they were put, explains the decision that they escaped the constitutional restriction on state debt.

Against the position emerging from these cases, opponents argue forcefully that a debt limitation confined to commitments of tax revenues cannot prevent state or local officials from entering speculative or ill-considered undertakings without the prior consent of their constituents. That is true; in hindsight, the present contracts are an example. The law of debt limitations in general and the special fund doctrine in particular have had their share of criticism; upon a fresh start in the light of experience one might draw the lines differently. But the argument presents a task for lawmakers; it

comes too late for judges. As recently as 1976, Justice Holman's opinion in *Martin v. Oregon Building Authority, supra,* reiterated that the predominant purpose of debt limitations was to forestall irresponsibly imposed tax burdens, to protect against "burdensome and excessive taxation," *McClain v. Regents of the University,* 124 Or at 634, to "prevent exposing the sources of public revenue to potential hazard," *Carruthers v. Port of Astoria,* 249 Or 329, 337, 438 P2d 725 (1968),[13] and to preserve "the ability of future legislatures to avoid a tax increase." 276 Or at 135. Too many commitments have been made on that understanding to overturn it now, in the absence of a showing that a particular law or charter provision meant something else. And the interpretation of debt limitations as referring to commitments of tax revenues is defensible. It is not unreasonable to suppose that a community might wish to impose quantitative or procedural restraints on the perennial political urge to spend the next generation's taxes, yet not wish to extend the same restraints to the management of its public service enterprises as long as tax revenues are not obligated.

We do not accept the opponents' argument that utility rates in fact are equivalent to taxes because they have a comparable economic impact on ratepayers. Any charge for a public service reduces the user's disposable funds much as taxes do; that was true of the water charges in *Butler,* the dormitory rents in *McClain,* the bridge tolls in *Rorick,* and the parking meters in *Morris,* each of which was a necessity for some class of users. Charges for these necessities are not inescapable in the same sense as taxes are. This is what makes general obligation debt preferable to creditors, and correspondingly cheaper. At some point it may become too expensive to drive or park a car, to attend a college, to water a lawn; and it also is possible to reduce one's consumption of electricity, to substitute another fuel, or in the case of a plant or institution, perhaps even to generate one's own electricity. If an unforeseen event prices too many users out of the market for the service, the creditor also loses the only source of repayment. In equating a commitment of future rates, expensive as it may prove to be, to a pledge of future taxes, the opponents simply attack the "special fund" premise of this long-established line of decisions in another way.

---

[13] "Public revenue," in the *Carruthers* opinion, referred to tax revenue.

■ Nor, finally, do we agree with the contention that the Participants' Agreements in fact expose the cities to general liability. The agreements plainly were intended to exclude any obligation that would bring them within the various debt limitations. That was understood to be essential to their validity, and they must be interpreted accordingly. *Public Market Co. v. Portland, supra,* 171 Or at 565. The agreements expressly negate any obligation to pay except from the revenues derived from the ownership and operation of a participant's electric utility properties. The exclusion of any broader liability deserves to be taken at face value. *See Carruthers v. Port of Astoria, supra,* 249 Or at 339-340.

## VI. PROHIBITION OF "STOCKHOLDING" OR "LOANING CREDIT"

The preceding sections have discussed bonding procedures and debt limitations that could be satisfied, if necessary, by putting the intended commitment to the WPPSS projects to a vote of the respective participants' voters. Beyond those issues, the opponents also invoke constitutional limitations which could not be so satisfied but would prevent the cities and districts from entering into these transactions altogether.

■ Article XI, section 9 of the Oregon Constitution provides:

> "No county, city, town or other municipal corporation, by vote of its citizens, or otherwise, shall become a stockholder in any joint company, corporation or association, whatever, or raise money for, or loan its credit to, or in aid of, any such company, corporation or association. . . ."[14]

The opponents contend that the participants became "stockholders" in WPPSS and in WNP 4 and 5, that they "raised money" for WPPSS and the projects, that they "loaned their credit" to WPPSS as the security for its bonds, and that, however characterized, the effect of the financing scheme was

---

[14] The section continues with a proviso adopted in 1917 to allow ports to offer a bonus in aid of water transportation.

Districts are municipal corporations. *In re People's Utility District,* 160 Or 530, 86 P2d 460 (1939). The PUDs' brief in this case adopts the arguments of the ratepayers and cities under Art XI, § 9.

to create the kind of risks that the constitutional provision was designed to prevent. The proponents respond that WPPSS has no "stock," that the constitutional clause only applies to funds invested in or raised for private enterprises, and that, again, it applies only to the use of general tax revenues. Each side relies on passages from past opinions discussing the scope of Article XI, section 9. The proponents quote statements that the clause is directed at using public funds in aid of private corporations, as said in *Carruthers v. Port of Astoria, supra,* 249 Or at 340, and *Johnson v. School District No. 1,* 128 Or 9, 12, 270 Or 764, 273 P 386 (1929). *See also Sprague v. Straub,* 252 Or 507, 511-518, 451 P2d 49 (1969) (discussing parallel prohibition of Article XI, section 6). The opponents quote from the same opinions statements that the targets of the section were "speculation" *(Johnson)* and a "potential hazard" to public revenues, *Carruthers v. Port of Astoria, supra,* at 329.

These statements, of course, are not inconsistent. No doubt those who drafted the prohibitions had in mind the practice of aiding private enterprise, and the quoted statements were made in that context; the cases did not have to consider speculative investments in securities of enterprises that might not be "private."

The opponents make a good textual argument for the position that the word "corporation," as used in Article XI, was not confined to today's business corporation but included public as well as private corporate entities, and that the phrase "any joint company, corporation or association, whatever" in section nine encompasses an entity such as WPPSS.[15] We also may assume for this argument that the term "stockholder" does not allow evasion by substituting another word to describe a financial investment in such an entity that is neither repayable as a debt nor part ownership of identifiable

---

[15] The creation and powers of corporations and the liability of their shareholders were controversial topics in the 1857 constitutional convention. They were coupled, significantly enough, with the topic of "internal improvements," meaning economic development. *See Carey,* The Oregon Constitution 147, 232-278. Or Const Art XI, § 2, which provided that "[c]orporations may be formed under general laws, but shall not be created by specific laws, except for municipal purposes," shows the 19th century usage of "corporation" to include municipal as well as business or other private entities.

property. The hypothesis distinguishes the transactions sustained in *Churchill v. Grants Pass,* 70 Or 283, 141 P 164 (1914) (agreement to build a railroad for lease or sale to private company), and *Security Co. v. Baker,* 39 Or 396, 65 P 369 (1901) (common ownership of real property with private company). Even on these assumptions, the Participants' Agreement did not make the participants "stockholders" in WPPSS, a statutory entity composed of Washington cities and public utility districts. Nor are we persuaded that the 88 participants themselves formed an "association" in which they held "stock" within the meaning of Article XI, section 9.

Equally unconvincing is the argument that the participants "raised money" for WPPSS; if anything, WPPSS, by selling its revenue bonds, raised money intended to benefit the participants. Of the several prohibitions combined in Article XI, section 9, of the Oregon Constitution, the opponents' most plausible claim is that WPPSS was able to sell its bonds only on the strength of the participants' "loan" of "credit" in the form of their unconditional promises to pay the bills.

Past opinions discussing these constitutional provisions include some cases in which the government became a co-owner of property or borrowed funds to aid a private enterprise in a desired economic development. *See Miles v. City of Eugene,* 252 Or 528, 451 P2d 59 (1969) (joint construction of power plant); *Carruthers v. Port of Astoria, supra* (municipal financing of aluminum reduction plant for long-term lease to specified private company); *Hunter v. Roseburg,* 80 Or 588, 156 P 267, 157 P 1065 (1916) (municipal bonds for joint railroad project with railroad company and lumber company). These more properly illustrate "raising money" than "lending credit." By forbidding the state to "lend" and local governments to "loan" their credit, as well as to hold stock in or raise money for a corporation, Article XI covers transactions in which government does not itself raise and transfer funds but places its credit behind the corporation's ability to borrow money or obtain goods on credit. The obvious example is an outright guarantee made directly to a creditor to pay another's debt. Although the Participants' Agreements with WPPSS are not literally guarantees to the bondholders, the opponents argue that they are the functional equivalent and should be treated as such.

Indisputably WPPSS undertook and was able to sell bonds and begin construction on the strength of the participants' commitments to pay the bills sent by WPPSS as they came due. The transactions were built around those commitments. That might be true of any private project undertaken to satisfy a specific governmental demand and financed on the basis of a long-term lease or contract, at a price tied to the supplier's costs. What makes these agreements into a loan of credit rather than a purchase contract, according to the opponents, is that the participants assumed the "dry hole" risk in section 6(c), *supra* n. 2, which committed them unconditionally to pay all that WPPSS would borrow and spend without assurance of receiving anything in return.

Although this seems to state a plausible distinction between a cost-based purchase contract and a loan of credit, on examination it proves to be doubtful. The argument implies that the agreements would be valid as long as they were contingent upon the delivery of some electricity to the participants, at whatever cost. It is not obvious why the legal character of the transaction should differ if the power plants were completed at great cost but produced only a small fraction of the expected electricity rather than none. In either event WPPSS would have obtained the necessary funds upon the assurance of the participants' obligations to pay.

But we need not decide whether an unconditional agreement to pay the costs of a speculative source of supply ("project capability") would constitutionally differ from an agreement to buy an unspecified quantity of electric power priced at equally speculative costs, if the agreement involved a general obligation to pay from public funds. This court's past interpretation of Article XI, section 9, as of the other debt limitations, once again has confined the prohibition against loans of credit to those which expose the government's general credit, that is to say, its taxing power. Thus *Miles v. City of Eugene,* 252 Or at 531, cited *McClain, Moses,* and *Carruthers* for the proposition that the "loan of credit" clause "is not a restriction upon the obtaining of funds by a municipality by the sale of revenue bonds, as distinguished from general obligation bonds." The court explained *Carruthers v. Port of Astoria, supra,* as follows:

"In that case the Port proposed to raise funds by the sale of revenue bonds. With the funds the Port was going to build an

aluminum reduction plant, lease it to a private company, and grant the private company an option to purchase the plant at the end of 25 years for a nominal balance. We held that this did not amount to raising money for a private business or loaning credit to, or in aid of, the private company. Likewise, the proposal in this case would not come within the constitutional prohibition against raising money or loaning credit. Money coming from revenue bonds and not from tax money does not fall within the prohibition."

252 Or at 533-534. And the *Miles* opinion concluded, at 537:

"In this case and in *Carruthers v. Port of Astoria,* supra (438 P2d 725), the parties attacking the constitutionality of the proposals relied strongly upon *Hunter v. Roseburg,* 80 Or 588, 156 P 267, 157 P 1065 (1916). That case is distinguishable because in that case the city was proposing to finance the construction of a railroad with general obligation bonds payable from general tax levies."

It may well be that the ban on stockholding, raising money for, or lending credit to corporations aimed to bar favoritism, corruption or other misuse of political institutions to aid particular private enterprises as well as to protect public finances against speculation. Private use of government credit is not the issue in financial transactions among governmental entities like the cities, the districts, and WPPSS. And even if the aim to protect public finances should cover speculative commitments to enterprises whose "private" or "public" character may be doubtful, the foregoing cases have defined the protected funds to be only tax revenues.

When government engages in public services or activities that generate revenues other than taxes, this court's past decisions have let government commit those revenues to financing its own projects or to support desired private projects, though of course it remains in the power of state and local lawmakers to provide otherwise. These judicial decisions often were obtained before the actual execution of financing schemes that the communities concerned deemed desirable, as in *Miles* and *Carruthers, supra.* The law there pronounced cannot be disregarded or overturned because a set of commitments made in reliance thereon has come to grief.

## VII. CITY AUTHORITY

The ratepayers and four municipalities, Bandon, Cascade Locks, Drain, and the Canby Utility Board, contend

that the cities had no authority by charter or by statute to enter into the Participants' Agreements. The cities of Springfield, McMinnville and Milton-Freewater, along with WPPSS, defend their authority to do so. The trial court held as a conclusion of law that "Municipal Participants do not have charter authority, either express or implied, to enter into the Participant's Agreement." More specifically, the court concluded that the agreements were a "guaranty" and a "pledge of systems revenues" to secure the obligations of WPPSS, and it held the agreements ultra vires because "Municipal Participants do not have statutory or charter authority to enter into such guaranty, security relationship or pledge, nor do they have statutory or charter authority to exercise extramural powers."

As stated earlier, it is inaccurate to treat the law of the cities' charter powers collectively rather than individually. To paraphrase what we said of debt limitations, the definition of charter powers is an individual matter for each city, a form of local legislation to be interpreted by the same means as any other legislation, including attention to the intent and purpose of those who adopted it. The briefs devote much space and attention to quotations from past opinions, which in turn quoted treatises quoting caselaw, on "strict" or "liberal" construction of charter powers. But such supposed judicial "rules of construction," though fairly quoted, are of limited utility in interpreting a particular city charter.

Again, charter authority "is not a matter of common law, to be resolved by consulting case law or encyclopedic summaries of case law." *Supra,* pp. 24-25. Adoption of a charter is a political act of a particular community at a particular time. A court's decision that one city did not have authority to undertake a project does not decide whether another city has such authority, or the same city at another time. A city can write or amend its charter or ordinance to define for itself what functions and services it wants its agencies to perform, consistent with statutes and the constitution. Within those constraints, a city may empower its government to operate utilities, including the distribution or the generation of electricity, or it may deny or limit that power. An earlier case involving the sale of electric power by one of the present parties, for instance, hinged on a provision of the McMinnville city charter that allowed it to sell such power to

citizens of the city "and vicinity." *Yamhill Elec. Co. v. City of McMinnville,* 130 Or 309, 274 P 118, 280 P 504 (1929). A charter also may specify whether it means to authorize only acts expressly mentioned, or others implied in order to achieve wider objectives, or perhaps specify different principles depending upon the function. In fact, the charters of several cities in this case contain directives that they be "liberally construed." To repeat, under home rule these are political choices for the cities; they will not be imposed by courts in the name of judicial doctrines. The court can only try to determine what political choice is expressed or implied in the charter or other source of authority.

Each of the cities here has charter provisions pertinent to the purchase of electricity. The Canby, McMinnville, and Springfield charters create separate utility boards or commissions. In the case of the Springfield Utility Board, whose authority is disputed by the Springfield ratepayers, the charter authorizes the board to act for the city "in connection with all matters relating to the management, operation, acquisition, and financing of all electric . . . properties now owned or hereafter acquired by the city of Springfield." The "properties" referred to may be either generating or distributing facilities. It is unnecessary to construe the "properties" as including electricity, because actions taken to secure a future supply of electric power plainly relate to the management and operation of a distributing system.

Some of the other cities may have undertaken to distribute electricity under older terminology authorizing them to provide street lighting or "furnishing their inhabitants with gas or other lights," or under more general authority to provide services for their citizens. Their authority to provide electric utility service has long gone unchallenged and is not challenged here. The opponents do not put in issue any of the cities' authority to provide electric service and to obtain the necessary electric power from others. Understandably, none of the cities themselves nor the ratepayers argue that any of the respective charters do not permit the city to operate an electric utility system, to acquire electric power from distant suppliers, or to secure such supplies by long term contracts. They deny only that the authority to contract for future supplies of power extends so far as to enter into the Participants' Agreements used in this instance.

■ One of the arguments made by the opponents and accepted by the circuit court is that the agreements involve an "extramural" exercise of municipal power for which cities need authority from the state as well as from their own charters. They cite cases of an earlier generation that recited this rule in general terms, although the decisions rarely invalidated the particular activity in issue. *See, e.g., City of Salem v. O.-W. Water Serv. Co.*, 144 Or 93, 23 P2d 539 (1933) (sale of city water outside the city authorized by law and charter); *Yamhill Elec. Co. v. City of McMinnville, supra*, 130 Or 309, 274 P 118 (1929) (same for sale of electricity); *State v. Port of Astoria*, 79 Or 1, 154 P 399 (1916) (sustaining legislation for operations of port). *Richards v. City of Portland*, 121 Or 340, 255 P 326 (1927), denied the city's power to sell water beyond its boundaries, but that was in defense against a claim of nonresident plaintiffs that the city was bound to sell them water, and in *Yamhill Elec. Co. v. City of McMinnville, supra*, two years later the court said that "all expressions in the opinion in that case must be construed with reference to the issue there being tried." 130 Or at 340.

A broad generalization that a city has no "power" or "authority" beyond its borders does little to explain what constitutes an exercise of "power" or "authority." It does not explain, for instance, why these terms apply to a city's sales of goods or services outside its borders more than to its purchases. Nor is it always clear whose interests the rule is meant to protect, those of the citizens who have authorized the city's action or those of the surrounding governmental entities and their inhabitants. Possibly the early opinions reflect concern about competitive encroachments by municipal enterprises or private business more than legal analysis. *See, e.g., Yamhill Elec. Co., supra*. Perhaps also the installation of permanent city facilities, even if accomplished by ordinary "proprietary" transactions, may sometimes represent an extension of the city's presence beyond its borders that should be authorized by the state rather than only the city's own citizens. *See, e.g., Riggs v. Grants Pass*, 66 Or 266, 134 P 776 (1913). Primarily, however, the concept of "extramural power," power "outside the walls," is relevant when a city undertakes to assert coercive authority over persons or property outside its boundaries. It has little relevance to a city's contracts or other consensual transactions in goods or services, although an

exercise of eminent domain outside city limits, for instance, would be an exercise of extramural power.

The opponents attack as "extramural authority" the provisions of the agreement that afford the participants certain privileges in supervising the construction and operation of the projects by means of a Participants' Committee. Without setting out these provisions here, we agree that they would be a significant exercise of authority if a city attempted to impose them upon any enterprise not its own. In such a case the location of the projects outside the city could be significant. But the cities did not impose these provisions on WPPSS as an exercise of municipal power. Rather, their inclusion in the agreement between WPPSS and the participants clearly was a safeguard designed to give the participants a means to protect their interests in the success and the cost of the new source of power that WPPSS was contracting to provide for them. If the agreements survive the other attacks made upon them, the cities needed no additional authorization to share this protective function merely because the projects would be built outside their boundaries.

The circuit court also concluded that the agreements constituted an unauthorized "guarantee" of debts incurred by WPPSS, which were "secured" by a "pledge" of the municipal utility systems' revenues. We do not agree.

In Part VI above, we discussed essentially the same characterization of the agreement in rejecting the contention that the agreements were a forbidden "loan of credit" to WPPSS. There we noted that any long-term contract to buy a supplier's unspecified output at a price tied to the supplier's cost might serve as the economic basis for financing the supplier's purchase or construction of the requisite facility, and that the opponents distinguished the present agreement from such a contract only because the participants unconditionally obligated themselves to pay their share of those costs even if WPPSS was unable to deliver any power in return. We were not persuaded that the legal character of the transaction (as a purchase contract or a "loan of credit") should differ if the power plants were completed at great cost but produced only a small fraction of the expected electricity rather than none.

■ A legal distinction between a little electricity and none is even less apparent when the issue is charter authority, because here we deal with grants of power to responsible city officials rather than the meaning of a limiting term such as "loan of credit." If a city may commit itself to purchase at cost whatever a supplier using its best efforts can produce from facilities which will be financed in reliance on the city's contract, however small the production and however expensive the product turns out to be, then we see no reason why this authority stops at contracting to pay the costs if small and costly deliveries should turn out to be none at all.

These agreements proved unwise in retrospect, and with the benefit of hindsight they may appear to have been unwise when made. But that is no reason to find them unauthorized. When a city has authority to provide electric power or other public services, that authority cannot well be construed to permit wise but to exclude unwise contracts. A long-term commitment to pay the cost of a needed source of supply could prove to be a financial calamity in many imaginable situations. A city might contract to assure itself of a supply of oil in a period of shortages and high prices only to have the market price collapse in a subsequent oil glut. (Conversely, if McMinnville in the *Yamhill Electric Co.* case, *supra,* had made a firm contract to sell power it considered surplus, it later might have found itself having to pay far higher market price to replace it.) A city college might enter a long-term lease in order to have an apartment building converted to a dormitory for which there turns out to be no student demand. A desert city in need of a water supply might contract with some other entity to cover the costs of drilling wells in search of such a supply irrespective how little water was found. In the first example the price is excessive, the second acquisition proves superfluous, and the third may produce nothing in return for the money, but with respect to the issue of the cities' authority they are the same in principle. What distinguishes the present case is only the magnitude of the sums involved.

A separate question remains whether the cities gave an unauthorized guarantee of the obligations, not of WPPSS, but of their fellow participants, when their unconditional obligation to pay regardless of deliveries is coupled with their agreement to pick up the shares of defaulting participants up

to 25 percent of each participant's original share. We return to that question below.

## VIII. THE PEOPLE'S UTILITY DISTRICTS.

Like the cities, the people's utility districts claim that they acted *ultra vires,* that is to say, exceeded their authority, in entering the Participants' Agreements. Of course, the PUDs' authority does not depend on individual charters, and there can be no question of their broad authority to enter into transactions appropriate to the operations of an electric utility; that is their function. Rather, the PUDs' contentions, like the cities', also turn on characterizing the agreements as assuming debts or guarantees and not as power purchases.

The law governing PUDs is found both in the constitution and in statutes. Article XI, section 12, of the Oregon Constitution, adopted by means of an initiative in 1930, specified certain purposes and powers of such districts and directed the Legislative Assembly to provide any necessary legislation to carry out the provisions of the constitutional amendment.[16] That legislation is found in ORS chapter 261.

---

[16] Or Const Art XI, § 12:

"Peoples' Utility Districts may be created of territory, contiguous or otherwise, within one or more counties, and may consist of an incorporated municipality, or municipalities, with or without unincorporated territory, for the purpose of supplying water for domestic and municipal purposes; for the development of water power and/or electric energy; and for the distribution, disposal and sale of water, water power and electric energy. Such districts shall be managed by boards of directors, consisting of five members, who shall be residents of such districts. Such districts shall have power:

"(a) To call and hold elections within their respective districts.

"(b) To levy taxes upon the taxable property of such districts.

"(c) To issue, sell and assume evidences of indebtedness.

"(d) To enter into contracts.

"(e) To exercise the power of eminent domain.

"(f) To acquire and hold real and other property necessary or incident to the business of such districts.

"(g) To acquire, develop, and/or otherwise provide for a supply of water, water power and electric energy.

"Such districts may sell, distribute and/or otherwise dispose of water, water power and electric energy within or without the territory of such districts."

Although this provision uses the spelling "Peoples'," the statutes use "people's." We follow the statutory spelling as more grammatical.

The constitution includes among the authorized purposes "the development of water power and/or electric energy" as well as its distribution and sale. It empowers the districts to levy property taxes, to issue, sell and assume bonds or other debt, to make contracts, to acquire property necessary or incident to the PUDs' business, and to acquire, develop, or otherwise provide for electric energy for distribution both within and outside their territories. These powers are spelled out in greater detail in ORS 261.305 - 261.390.

As discussed in Part III of this opinion, additional provisions enacted in 1967 address the participation of PUDs in jointly owned power generating facilities. ORS 261.235 - 261.255. A district also may join in the formation of a "joint operating agency" for the generation and transmission of electric energy under ORS chapter 262. The districts did not use the procedures of these statutes in entering their agreements with WPPSS.

The crux of the PUDs' claim that their participation was *ultra vires* is that the Participants' Agreements created a form of debt that a PUD may incur only after obtaining approval of its qualified voters. ORS 261.305(6) requires such a vote for issuing revenue or general obligation bonds by procedures further specified in ORS 261.355 - 261.375.[17] WPPSS responds that the PUDs did not issue bonds but only entered into a long-term contract to buy a share of whatever power WNP 4 and WNP 5 might be capable of delivering, at a price based on the cost of that capability.

---

[17] ORS 261.305(6):

"'To borrow money and incur indebtedness; to issue, sell and assume evidences of indebtedness; to refund and retire any indebtedness that may exist against or be assumed by the district or that may exist against the revenues of the district and to pledge any part of its revenues. Except as provided in ORS 261.380, no revenue or general obligation bonds shall be issued or sold without the approval of the qualified voters. The board of directors may borrow from banks or other financial institutions, on notes payable within 12 months, such sums as the board of directors deems necessary or advisable; however, the amounts so borrowed, together with the principal amounts of other like borrowings then outstanding and unpaid, shall not exceed the amount which the board of directors estimates as the district's net income (determined in accordance with the system of accounts maintained by the board pursuant to ORS 261.470) for the 12 full calendar months following the date of the proposed borrowing, adjusted by adding to the net income an amount equal to the estimated charges to depreciation for the 12-month period. No indebtedness shall be incurred or assumed except on account of the development, purchase and operation of a utility.'"

The PUDs concede that they did not issue bonds; WPPSS did. They argue, however, that the Participants' Agreements shared such essential characteristics of revenue bonds that they were "identical in substance" to issuing such bonds. The characteristics referred to are that the PUDs obligated themselves to pay a proportionate share of all costs of the projects, including debt service and termination costs, that they would set their own rates high enough to produce the needed revenue, and that the obligation was unconditional, whether or not the projects produced any power or WPPSS breached the agreements. Because the same obligations are typical of revenue bond financing by the PUDs themselves, and because WPPSS offered its prospective bondholders no source of repayment other than these contractual obligations of the participants, the PUDs describe WPPSS and its bonds as a mere "conduit" for financing the projects with revenues "pledged" by the participants, relying essentially on the precedent of *Martin v. Oregon Building Authority,* 276 Or 135, 554 P2d 126 (1976).

We have reviewed and rejected that analysis in Part IV, above. But the PUDs also point to the sentence in ORS 261.305(6), *supra,* that allows the directors to borrow from banks and financial institutions "on notes payable within 12 months" no more than the district's estimated net income for the 12 months following the "borrowing." The PUDs contend that this sentence limits their authority to "incur indebtedness" toward other than "banks or financial institutions," if it is not to have a loophole fatal to the apparent legislative purpose. They argue that if the restriction of ORS 261.305(6) applied only to banks or financial institutions, nothing would limit a PUD's authority to "borrow from General Motors, the Fred Meyer Trust, an Arab sheik or any other person with money to loan."

We may agree with the argument that the statutory limitation might apply to borrowing from any lender, whether or not it is primarily a bank or "financial institution" in the ordinary usage of those terms. But we need not decide this here, because we do not find any borrowing by the PUDs in this case.

The PUDs' brief quotes passages from *Fullerton v. Central Lincoln Utility Dist.,* 185 Or 28, 201 P2d 524 (1948), to

the effect that the purpose of limiting the amount of borrowing without prior approval of the voters was "to require the directors to conduct the affairs of the district upon a pay-as-you-go basis," to require them "to carry on their corporate operations upon a cash basis," and "to put a brake upon the runaway enthusiasm of the directors." 185 Or at 36-37, 44. The first two passages actually quoted books speaking generally about requirements for borrowing, not words of this court interpreting ORS 261.305(6), but they may state the general purpose of such requirements well enough. They were pertinent to *Fullerton,* which was a borrowing case. In *Fullerton,* the district actually issued revenue bonds, claiming that no prior approval by the voters was needed because the amount of the bonds did not exceed "the ordinary annual income and revenue of the district." The issue was whether these words in what is now ORS 261.305(6) meant gross revenue or net revenue, and the court held that they meant the district's "ordinary net annual income" for the year in question. 185 Or at 38. But *Fullerton* did not deal with purchases. It did not hold that a PUD might not commit itself to a long-term power supply contract because the total commitment exceeds one year's net income, as long as such income covers the payments due during the year. We decline to hold so now.

For the reasons stated in Part VII with respect to the cities, the PUDs did not enter into an unauthorized "guarantee" of the bonds issued by WPPSS, as distinct from the question whether they guaranteed the obligations of their fellow participants, discussed below.

## IX. OTHER ISSUES

### A. *Delegation.*

The opponents contend that the participants' covenant to maintain electric rates adequate to meet payments due under the agreement, *supra,* n. 2, unlawfully binds the future leadership of the cities or districts or unlawfully delegates their ratemaking authority. In the interest of not further lengthening this opinion, we do not review and distinguish the opinions quoted for the limits on elected officials in this respect. The short answer is that if the cities and PUDs, in managing their electric utilities, have the authority to make long-term financial commitments payable exclusively from future electric revenues, they also have authority to promise

that the revenues will be maintained at a level adequate to meet the commitments. Otherwise a contractual obligation limited to such revenues could be avoided simply by setting rates too low to meet it, which means that in practice it could not be negotiated at all, or that the contract would have to be executed as a general obligation to be paid from other sources, including taxes, with all the legal consequences of such an obligation. The opponents in fact concede that a city may enter into a rate covenant when authorized by statute, without offering a reasoned explanation why a statute could overcome what purports to be a fundamental principle of governmental responsibility.

The Participants' Agreement does not set specified electric rates for any participant. It does not let WPPSS set the rates. The cities and PUDs retain responsibility for determining their rate schedules with respect to classes of service, classes of customers, minimum amounts, or whatever otherwise permissible variables they choose. They promised only to collect revenues adequate to cover their contractual obligations. That is not an unlawful delegation of power if the contractual obligations themselves are within their authority. These contentions therefore stand and fall with the opponents' challenge to the cities' and PUDs' authority to make the underlying contract.

B. *Public Policy.*

The PUDs argue, and the circuit court held, that the Participants' Agreement contravened the public policy expressed in the laws governing the PUDs' operations, ORS chapters 261 and 262. We note the difference between an argument that a contract among private parties is unenforceable under some governmental policy recognized by the courts and an argument that governmental action itself is against "public policy." When applied against governmental action, the "public policy" contention only argues for a nontechnical application of the policies and purposes of the governing statutes, and that is how the PUDs present it here. "Statutory policy" probably is a better term than "public policy" to avoid confusion between the two.

We have mentioned in Parts VII and VIII a possible issue whether the cities and the PUDs may turn out to have exceeded their authority in one respect which also is an issue

of statutory policy. This issue may arise from the "step-up" clause, § 17(c), which increases each participant's share under the agreement up to 25 percent to cover possible defaults by other participants. Insofar as the step-up clause covers assumption of a defaulting participant's share in the "dry hole" risk, that is to say, in the eventuality of a total failure of the projects, it may be argued to be a "guarantee" of the defaulting participant's debt rather than purchase of an increased share of project capability. Such a guarantee may be beyond the cities' respective authorities. It also may be contrary to the statutory policy of ORS 225.480, as to the cities, and ORS 261.250, as to the PUDs, to which we have referred in Part III. We do not decide that question, because the only issue now before us is whether the agreements were invalid when the cities and districts entered into them, and a contingent promise to take an increased share of power or power capability would not necessarily be an impermissible "guarantee" at that time. Whether there are defenses arising out of developments subsequent to the cities' and districts' initial entry into the agreements is not before us in this appeal.

Apart from this possible issue, however, we think that the claim of statutory, or "public," policy adds nothing to the previous analysis of the statutory law itself. Statutes, of course, are susceptible to interpretation that takes account of their intrinsic policies and purposes. But if "public policy" were a separate and additional argument beyond the statutes, it would become a wild card in litigation that would undermine the ability to enter transactions in reliance even on the most sophisticated interpretation of the state's laws. As we find no violation of the statutes when the PUDs entered into the Participants' Agreement, we also do not find that they violated the state's public policy.

C. *Other States.*

We add a few words about the decisions of other supreme courts concerning these agreements.

The Supreme Court of Idaho has held that five Idaho cities exceeded their authority in entering the Participants' Agreement with WPPSS. *Asson v. City of Burley,* 105 Idaho 432, 670 P2d 839 (1983). The court held that the obligations undertaken by the cities contravened the municipal debt limitation stated in Idaho's constitution. Article 8, section 3 of

that constitution forbids any local government to "incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year" without a vote of qualified electors and provision for a tax to pay the interest and principal, and it provides that any indebtedness or liability incurred contrary to the section "shall be void." The issue before the Idaho court was whether the cities' obligations to WPPSS escaped this debt limitation clause because repayments were to be made exclusively from utility revenues rather than taxes, and the court held that the clause nevertheless applied because past Idaho precedents had rejected the "special fund" doctrine that confines debt limitations to debts that expose future tax revenues. 670 P2d at 845-6, *citing Feil v. City of Coeur d'Alene,* 23 Idaho 32, 129 P 643 (1912). Although subsequent amendments of Idaho Constitution, Article 8, section 3, had exempted "special fund" financing for some purposes, the court held that the Participants' Agreement did not qualify under any theory.

Justice Bakes dissented. He maintained that "only because, through hindsight, the majority can see what a 'bad deal' the cities have made that they now attempt to extricate these cities from their precarious position" on constitutional grounds. The dissent also noted that the cities in fact might have defenses under ordinary contract law which were not involved in the constitutional challenge brought before the Idaho court, and concluded that the court "should not bend our Constitution in an effort to release from liability public entities who have improvidently, but constitutionally, entered into contracts from which they may also be relieved because of contractual defenses." 670 P2d at 851. In any event, the Idaho court's decision differs from ours simply because Oregon law does and Idaho law does not recognize the "special fund" rule that confines debt limitation clauses, unless otherwise stated or intended, to debts that potentially expose the government's tax revenues.

The Supreme Court of Washington, also in a split decision, relieved that state's municipal participants of their obligations on different grounds. *Chemical Bank v. Washington Public Power Supply System, supra.* The majority held that their agreement with WPPSS was *ultra vires* because, although each participant had authority to contract for the

purchase of electric power, it did not have authority to contract to pay for power generating capability that might turn out to be zero. The dissenters, Utter and Dolliver, JJ., would hold that the authority to purchase power also includes the authority to contract for a share of an uncertain supply of power yet to be developed. This dissent, like Justice Bakes's in Idaho, also protested that the majority undertook to save Washington municipalities from the consequences of the mismanaged WPPSS projects at the cost of narrowly restricting the authority of local governments to serve their citizens.

On this issue, our view of Oregon's tradition of local autonomy and local responsibility is closer to that expressed by Justices Utter and Dolliver than to the majority's restrictive reading of Washington law. As stated in Parts VI and VII of this opinion, once it is conceded that the cities and PUDs had authority to contract for a share of an uncertain amount of electric power at a price based on the proportionate costs of that share, no legal reason appears why their authority ceases at the point where the possibility of little power at exorbitant cost includes the possibility of no power at all.

We therefore agree with the basic position taken by the defendant cities, Springfield, McMinnville and Milton-Freewater. A supplemental memorandum filed by these cities suggests that the Washington court's decision released so many of the other participants that by the terms of the Participants' Agreement itself any question of the Oregon cities' authority to enter the agreement is moot. That point may relate to the possible "contractual defenses" mentioned by Justice Bakes's dissent, above. It does not relate to the present action, which was brought by parties who seek to invalidate the transaction, not by parties who seek to enforce it. We therefore express no view of any defenses to such an action under the agreements. We hold only that the transactions were not beyond the authority of the cities and PUDs or otherwise illegal when they were made.

## X. CONCLUSION

In summary, the issues in the present litigation are whether the plaintiffs' action should have been dismissed as untimely, and if not, whether the named Oregon cities and people's utility districts had authority in 1976 to enter into the

Participants' Agreement, and whether in doing so they violated any limitations in their respective charters, in statutes, or in the Oregon Constitution. This case and our decision does not involve any question of anyone's present obligations if the agreements were validly made at that time.

The authority to make contracts for city and PUD electric utility systems and the limits on that authority have long-term importance beyond the WPPSS debacle. We judge these issues as of the time the transactions were made, not by hindsight. First, we agree with the cities of McMinnville, Milton-Freewater, and Springfield that the cities had authority under their respective charters to make the agreements. So did the PUDs under Article XI, section 12 of the Oregon Constitution and the statutes enacted to effectuate that section.

Second, we hold that the cities' and PUDs' existing authority was not narrowed by enactment of the Thermal Power Facilities Act or the Joint Operating Agency Act, with the possible exception that ORS 225.480 and ORS 261.250 may impose a statutory policy against guaranteeing the financial obligations of other participants through the "step-up" clause when no power is supplied in return. That possibility would not vitiate the entire transaction when made and it need not be decided now.

Third, the bonds issued by WPPSS were not the bonds of the individual participants, nor did the cities or PUDs issue bonds in another form without complying with the procedures required for that purpose. Also, the PUDs' agreement to pay WPPSS did not constitute borrowing by the PUDs so as to violate the statutory limits on such borrowing.

Fourth, we follow long-established Oregon law in holding that the agreements with WPPSS did not contravene the cities' charter debt limitations because they were payable entirely from utility revenues, not from taxes. The agreements also did not represent an unconstitutional loan of credit to WPPSS, again because the cities' taxing power and future tax revenues were not obligated.

Fifth, the covenant to maintain utility revenues adequate to meet the participants' obligations did not delegate

the cities' or the PUDs' future authority to determine the actual rates by which the revenues would be collected.

When all is said and done, this case is about the exercise of powers and responsibilities entrusted by the people of Oregon to their local officials. The constitution and the laws reflect that Oregonians have been of two minds about this as about other matters. At least since the beginning of this century, Oregon more than many states has wanted its local communities to be able to act autonomously to serve local needs or desires. This tradition of venturesome community action is embodied in the adoption of the home rule amendments in 1906 and 1958 and the people's utility district amendment in 1930. But the constitution and statutes also hedge public ventures with procedural and substantive limits on financing those ventures by debt. These legal powers and limits must be known with substantial certainty if the state and local communities are to deal with others in accomplishing their necessary or desired projects. For many years it has been understood that, unless the opposite intent is shown, debt limitations in Oregon refer to debts that obligate the community's tax revenues. Substantial certainty in future public transactions requires respect for existing legal rules and precedents, even when hindsight calls a particular transaction into question. If any city, or the legislature, wishes to tighten the rules for the future, it is in its power to do so.

The design of the agreements at issue in this case went to the bounds of Oregon law. The argument that the bounds were crossed has been ably and strongly presented, but ultimately it asks us to hold that the design was illegal as a whole though it remained within each separate rule. Retrospective judicial evaluation of individual transactions by such a standard would not be a rule of law. Courts in other states have reached different conclusions under the laws of their states, which differ from Oregon's. The ultimate obligations and remedies of the present and other parties in the light of developments after 1976 are not before us now. We hold only that the Oregon cities and PUDs did not exceed the limits of their authority when they signed the Participants' Agreement at that time.

The decision to join in the agreement was one of policy for responsible public officials to make. It was made

under conditions and on terms largely created by BPA, the federal agency on whom local public entities have been dependent for supplies of electric power. Officials responsible for electric utilities without generating capacity were led to believe that they had little alternative to the proposal offered them. Their policy decision to commit themselves to a share of the power WPPSS would undertake to produce at projects WNP 4 and 5, including the risk of high costs and little or no power, may have been wise or unwise when it was made. But it was a policy choice, not one for this court to undo by devising new law for the purpose.

The decision of the circuit court is reversed and the case is remanded to that court for entry of a judgment and such further proceedings as may be necessary.

**LENT, LINDE and ROBERTS, JJ.,** concurring.

**PETERSON, C. J.,** concurring.

I join without reservation in the opinion of the court.

As is apparent from the separate concurring opinion of Lent, Linde and Roberts, JJ., the court is not in agreement on the laches question.

The main underpinning for their conclusion that laches does not apply appears to be that because a substantial part of this litigation is between governmental agencies and concerns the powers of those agencies, this case does not fit the assumptions for an implicit policy of the state to apply laches against belated claims of its own agencies. Such discussion as there is to support the stated conclusion is found at page 606 of the concurring opinion where this statement is made:

> "Assuming there is a policy implicit in the state's commercial or property transactions to secure private parties against the belated assertion of ordinary legal claims, this policy does not bar the present litigation for laches. The parties to this litigation are governmental entities, except for the ratepayers. WPPSS is a statutory agency and municipal corporation of the State of Washington, composed of other public agencies of that state. *See Chemical Bank v. WPPSS,* 99 Wash 2d 772, 666 P2d 329 (1983). The participants' agreements are not ordinary transactions with private parties in the commercial marketplace. They were designed for governmental entities, with the active participation of the federal Bonneville Power

Administration (BPA), and with conscious concern about the legal powers of the participating agencies. They are agreements between governmental officials to create and conduct a publicly administered program. The implicit policy of protecting existing property interests of private persons against delayed lawsuits when a public agency has dealt with them in a conventional commercial or property transaction simply does not apply to this program. The larger policy that normally excludes laches in actions brought to assert a public interest in the conduct of a public program does apply, at least as to the municipalities that are challenging the program." (Footnote omitted.) 296 Or at 606.

Their concurrence strikes me as lacking analysis to support the stated conclusion. If laches is otherwise assertable, why should the laches rule differ if the suit is between governmental bodies? I believe that the rule should be the same in both situations. Let me give an example to put the issue in clearer perspective.

Suppose the city of Drain (Drain is a small community south of Springfield. Both are parties in this case.) concurrently contracts with two parties for electrical power. One contract is with the city of Springfield; the other is with a private supplier, PNW Electric. Suppose that identical contract disputes arise between Drain and its suppliers and Drain seeks equitable relief. Finally, suppose that Drain is guilty of laches.

Under the theory of the other concurring opinion, PNW will successfully defend the Drain claim because laches will bar Drain's claim. Springfield's attempt to invoke laches will not succeed because it, like Drain, is a public body. Springfield and its citizens will be required to perform obligations which its private counterpart, under identical circumstances, will not be required to pay or perform.

The point is that if, under the facts of any case, equitable relief should be denied because it is inequitable to enforce the claim, whether the party invoking laches is a private person or a municipal corporation is beside the point. That has been the decision of every court which has considered the matter.[1] It should be ours as well.

---

[1] The writers of the other concurring opinion state that "[a] few cases contain statements to the contrary." 296 Or at 606. I have found no case that holds that if

In *Maricopa County v. Cities & Towns of Avondale,* 12 Ariz App 109, 467 P2d 949 (1970), a county sought to recover the amount of use fuel tax monies it had mistakenly paid to the defendant cities and towns. The court held that laches may defeat the claim, saying:

"Laches may also defeat a claim for restitution. Restatement, supra, § 148. Laches involves an unreasonable delay after knowledge of the facts which works a hardship. *Id.* The County contends here that laches cannot be so applied as to bar a claim by a public body in its governmental capacity. We agree to the extent that neither laches nor its generic parent, estoppel, can be asserted to gain rights against the public or to defeat the public interest. [Citing cases.] But the reason for the rule denying the defense disappears when the contest is solely between two public bodies. State ex rel. O'Connor v. Clay County, 226 Iowa 885, 285 NW 229, 235 (1939). Accordingly, as between municipal corporations, the defense of laches is available. Royal Oak Township v. School District No. 7, 322 Mich. 397, 33 N.W.2d 908, 911 (1948)."

The Michigan court reached the same result in *Royal Oak Tp. v. School Dist. No. 7,* 322 Mich 397, 33 NW2d 908 (1948). The Michigan court, in rejecting the claim that laches was not applicable against a municipal corporation, stated that "the law is well settled that as between municipal corporations the equitable doctrine is applicable."

The Supreme Court of Iowa, in *State ex rel O'Connor v. Clay County,* 226 Iowa 885, 285 NW 229, 235 (1939), applied laches, saying:

"Public policy in some cases does forbid the application of the doctrine of laches to the acts of an arm of the government through its representatives. This is for the protection of the public. But where two counties are the interested parties there is no good reason why public policy should require that the people of one be penalized for the laches of the representatives for the other. The law should as far as possible, protect both, without preference to either."

*See also Independent School District No. 4. v. State Board of Ed.,* 451 P2d 684, 687 (Okla 1969).

The cited cases state a rule directly contrary to the conclusion of the other concurring opinion. In Arizona and

---

laches otherwise were a defense it would not apply because both parties are public bodies.

Iowa, similar to Oregon, the general rule is that public policy forbids the application of laches to an arm of the government if a public right or public interest is at issue. In both of the cited cases from Arizona and Iowa, the courts nonetheless applied laches in cases involving governmental acts. In Oregon we have followed the governmental/proprietary distinction; laches is available as a defense to a claim of a public body acting in a proprietary capacity. Making laches available as between public bodies, especially when the actions at issue are proprietary, is consistent not only with our precedents, but with the policy cited above that the citizens of one public body should not be penalized for the laches of the representatives of the other.[2]

Laches is the label for a rule that relief will be denied as inequitable in those cases in which unreasonable delay in asserting rights results in disadvantage or prejudice. The rule is of long standing. The reasons for applying laches in disputes between governments are as applicable here as in a "conventional, commercial or property transaction," 296 Or at 606, and we should not abandon the doctrine in this case. If laches is made out, I would grant public bodies no fewer rights than private concerns. I see no reason to change the laches rule simply because the dispute is between public bodies.[3]

Because of the court's unanimous decision that the local public bodies who entered into the challenged agreements had legal authority to do so, it is not necessary to decide whether the trial court erred in striking the WPPSS laches affirmative defense. Therefore, all statements made in the concurring opinions concerning laches are dicta (except for this sentence).

Campbell, Carson, and Jones, JJ., join in this concurring opinion.

---

[2]Furnishing electric power is a proprietary function. *Twohy Bros. Co. v. Ochoco Irr. Dist.,* 108 Or 1, 40, 210 P 873, 216 P 189 (1922).

[3]I also disagree with a number of other statements contained in the other separate opinion but will not take the time and space to explain the reasons for my disagreement. The writers of that opinion would inter the governmental/proprietary distinction which has been applied in a number of cases and would overrule our precedents denying relief to private relators. 296 Or 605.

**LENT, LINDE, and ROBERTS, JJ.,** concurring.

The proponents of the validity of the challenged transactions contend that the plaintiffs' action is barred by laches or estoppel. Some members of the court believe that the issue of laches need not be reached if the plaintiffs' claim loses on the merits. We believe that it should be decided first. The court also is divided on the correct analysis.

"Laches" and "estoppel" are not different words for the same issue. A defendant's claim of laches arises from a plaintiff's prejudicial delay in asserting a claim for equitable relief, while conduct that gives rise to equitable estoppel, whether or not involving delay, vitiates the merits of the estopped party's claim. A defendant's assertion that a plaintiff is barred by laches from pursuing the claimed relief therefore should be dealt with before deciding the case on its merits. When laches is correctly seen as a time bar to plaintiff's action, like a statute of limitations, the claim must be disposed of before reaching the merits, not as a final obstacle to otherwise proper relief. If the only plaintiff or all plaintiffs in a case are disqualified by delay in commencing litigation, there is no party in a position to press the case. Litigation of the merits then is wasted time and effort and, on appeal, would reduce an opinion on the merits to dicta.

Here the opponents of the transaction argue that laches does not apply against governmental agencies, or if it sometimes can apply, then not under the circumstances of this case. This court has never arrived at a coherent analysis of Oregon law on this issue. It does not agree on a coherent analysis today. Statement of a rule is not simple, because Oregon law has developed partly from statutory policy and partly from cases that follow no consistent principle. Nevertheless, a principle emerges from the statute and past holdings that is sufficient for the present case. Because we believe it essential to identify one or more plaintiffs who are not barred by laches before the court reaches the merits, we analyze the court's past opinions and the applicable premises in some detail. We conclude that laches does not bar litigation solely between governmental units or officials that is designed to determine the legality of a governmental program or activity.

"Laches" means neglect or inaction, as in "laxness" or "laxity." The statutory time period within which to commence an action at law presumptively indicates what is

reasonable or unreasonable also for equitable relief, but the presumption can be overcome. *Albino v. Albino,* 279 Or 537, 553, 568 P2d 1344 (1977); *Wills v. Nehalem Coal Co.,* 52 Or 70, 90, 96 P 528 (1908).

It may be that if a private party had entered into a formal transaction as far-reaching and important as the one before us, on the strength of which others had irreversibly committed themselves to large and irrecoverable expenditures, and if the party waited five and one-half years to sue to be released from that transaction on grounds that it could not properly enter into it, the party's request for equitable relief would be barred by laches even though the statute allows six years to commence actions "upon a contract or liability." ORS 12.080. This is not an action upon a contract but to declare that no legal contract was made. But the cities and the PUDs are not private parties, and the ratepayers, who are private persons, were not parties to the challenged transactions. We therefore must examine how delay affects their rights to equitable relief.

Laches is often described as a "doctrine," and "doctrines," as compared with rules of law, are distinguished more by broad statements than by sharp cutting edges. This court's experience with fitting the doctrine of laches to the powers and duties of government is no exception.

The court early postulated that statutes of limitation do not run against the state, a postulate it found in the Latin *nullum tempus occurit regi,* unless the statute provides otherwise. *State of Oregon v. Warner Valley Stock Co.,* 56 Or 283, 308, 106 P 780, 108 P 861 (1910). The statutes did in fact provide otherwise from the enactment of section 13 of Deady's Code in 1862 until its amendment in 1903, Gen Laws § 13, p 18 (1903). *See State Land Board v. Lee,* 84 Or 431, 435-436, 165 P 372 (1917). The present statute, ORS 12.250, provides:

> "Unless otherwise made applicable thereto, the limitations prescribed in this chapter shall not apply to actions brought in the name of the state, or any county, or other public corporation therein, or for its benefit."

In the *Warner Valley Stock Co.* case, the court held that the state had failed adequately to allege and prove an excuse for its delay in suing to set aside certain deeds but should be allowed to amend its pleading, thus implying without discussion that the state's suit otherwise would be barred.

56 Or at 304, 312. On the strength of the implication in that case, the court in the next such suit said that it was "committed to the principle that the doctrine of laches is applicable to the state," but it held that laches was not shown. *State of Oregon v. Hyde,* 88 Or 1, 40, 169 P 757, 171 P 582 (1918). Whether or not the quoted statement was justified when applied to suits to undo past conveyances, those cases gave no occasion to consider its wider implications, for instance for suits directed at preventing continuation of an unlawful condition or activity.

Nevertheless, the court later quoted the broad sentence that "the doctrine of laches is applicable to the state" in cases in which the name of the state appeared only pro forma in actions by private relators to challenge the legality of school districts. *State ex rel v. School District No. 23,* 179 Or 441, 461, 172 P2d 655 (1946); *State ex rel School District No. 9,* 148 Or 273, 287, 31 P2d 751, 36 P2d 179 (1934). *See also State v. Union High School,* 152 Or 412, 53 P2d 1047 (1936). To apply the doctrine there the court had to turn what the statutes denominated as an "action at law" back into the extraordinary writ of *quo warranto* which the statutes had abolished and about which the court earlier had said that "[i]t is seldom that laches are imputed to a State in a *quo warranto* action to test the legality of an incorporation where the rights of the public are involved." *State ex rel v. Port of Tillamook,* 62 Or 332, 344, 124 P 637 (1912). The opinion in the *School District No. 9* case, *supra,* distinguished quo warranto actions brought to assert a public interest, in which the state is the real party in interest, from others brought in the name of the state by private parties in their own interest, and the court found the case to be of the latter kind. 148 Or at 276-278. Again, in the *School District No. 23* case, *supra,* the court found that "the relator, and not the state, is the interested party," before holding that a delay of one year barred a taxpayer with knowledge of the facts from challenging the legality of the district and causing what the court described as "deplorable consequences." 179 Or at 458-462.

The school district cases were treated as private actions by virtue of the characteristics of the relators and their interests. But when the state sued to set aside a probate order and to declare the decedent's property escheated to the state, the court rejected a defense of laches on the ground that it was

not available against a suit by the government "to enforce a public right or to protect a public interest." *State v. Vincent,* 152 Or 205, 214, 52 P2d 203 (1936).

Two decisions of that period involved the defense of laches against suits on behalf of local governments. In *Amer. Surety Co. v. Multnomah County,* 171 Or 287, 138 P2d 597 (1943), plaintiff sued as subrogee of Marion County and defendant claimed laches. Plaintiff apparently conceded that "the sovereign is not exempt from the defense of laches," but the court found it unnecessary to consider the defense because the action was at law. 171 Or at 324-328. *City of Pendleton v. Holman,* 177 Or 532, 164 P2d 434 (1945), was a suit to foreclose the lien of a street improvement assessment. Most of the opinion was devoted to rejecting defendants' argument that the statutes of limitations, though by then expressly excluding actions brought by governmental plaintiffs, nevertheless should apply against a city acting in its "private or proprietary capacity." The opinion described the street improvement as a "proprietary activity," and it again assumed without discussion that the foreclosure suit would be barred by laches, although the court held that the defendants had failed to plead the factual basis of this defense. 177 Or at 548. But in a third case, a school district's action to recover funds paid out by a bank, the court stated that it was "not here concerned with private dealings but with matters affecting the public," and referred to the " 'well-settled' " doctrine that " 'no laches can be imputed to a municipal corporation, acting ... in a public and governmental capacity.' " *School Dist. 47 v. U.S. Nat'l Bank,* 187 Or 360, 383-384, 211 P2d 723 (1949), *quoting Common School Dist. No. 61 v. Twin Falls Bank & Trust Co.,* 50 Idaho 711, 4 P2d 342 (1931).

The most recent discussion of laches as a defense against a belated claim by the state occurred in *Corvallis Sand & Gravel v. Land Board,* 250 Or 319, 439 P2d 575 (1968). That was a suit by a private company to enjoin an ejectment action brought against it by the State Land Board in order to establish the state's title to a riverbed, and the court noted that ejectment is an action at law and "laches is available only against a party seeking the aid of equity." 250 Or at 324. Nevertheless, Justice Lusk, for the majority, proceeded with an extended review of the foregoing precedents, quoting from *State v. Vincent, supra,* that laches will not bar a suit "to

enforce a public right or to protect a public interest," 250 Or at 332, and concluding that the state's action sought to establish a title held in the state's governmental rather than its proprietary capacity. The opinion denied that the *Warner Valley Stock Co.* case had involved a "proprietary" rather than "governmental" claim and declared the statement in the *Hyde* case that the court was "committed" to applying laches against the state to rest "upon an insecure foundation." 250 Or at 326-338.[1] Justice O'Connell, dissenting, maintained that these distinctions could not decide the fairness of allowing the government a delayed claim against a private party. Because the real controversy was over the right to gravel, which the state dealt with in the same manner as private persons, he would have applied laches in the same manner as in litigation between private parties. 250 Or at 330, 342.

Undeniably the distinctions between "public" and "private" rights or between "governmental" and "proprietary" functions are inexact tests for barring delayed suits by the state or local governments. As Justice O'Connell wrote, they may serve to label easy cases but fail in difficult ones. 250 Or at 341, n. 4. Moreover, those phrases are employed in other contexts where other rules or policies may cause these lines to be drawn differently than in the context of defenses against belated assertions of legal claims. Little is gained by describing an activity, for instance the construction, operation, and maintenance of streets or other public facilities, as "proprietary" for purposes of one legally correct outcome and "governmental" for purposes of another. Nor is it self-evident why an action to escheat a decedent's property asserts a "public" interest but an action challenging the legality of a school district asserts only a "private" interest when initiated by a taxpayer. *Compare State v. Vincent, supra, with State ex rel. v. School District No. 23, supra.*

Shortcomings in judicial formulas, however, do not prove error in the holdings they seek to express. The foregoing

---

[1] The court found it difficult to explain its then recent decision in *Johnson v. Tax Commission,* 248 Or 460, 435 P2d 302 (1967), which held an assessor estopped, in his obviously public function of tax collection, to insist on a filing deadline which the taxpayer missed because the assessor sent him an outdated form. The court simply described it as an "exception." 250 Or at 329. In any event, as the lead opinion in *Wiggins v. Barrett & Associates,* 295 Or 679, 669 P2d 1132 (1983) makes clear, *Johnson* and its successor, *Pilgrim Turkey Packers v. Dept. of Rev.,* 261 Or 305, 493 P2d 1372 (1972), dealt with estoppel, not with a defense of laches based on delay.

cases show that in barring suits by government for laches, lines sometimes have been drawn by the characteristics of the plaintiff, by the interest asserted, or by the relief sought. The lines obviously seek to accommodate competing policies, to preserve the legal responsibilities of government on one hand and fairness to those against whom government litigates on the other, but it does not follow that a balance between these policies simply is struck for each case. Without attempting a comprehensive statement in this case, we find in the past decisions elements for an analysis besides those already discussed.

First, the fact that "laches" is an equitable doctrine rather than statutory law tends to mask the fact that its application against the government nonetheless is as much a question of law as the application of a statute of limitations. Even when government sometimes acts like a private party, the two differ insofar as the state, unlike a private party, can legislate for itself whether to be bound by periods of limitation. *Cf. Wiggins v. Barrett & Associates,* 295 Or 679, 700-701, 669 P2d 1132 (1983) (concurring opinion). The legislature has done so in ORS 12.250, previously quoted, which exempts both the state and local entities from general periods of limitation. Obviously, the state's policy toward delayed private litigation is not its policy toward delayed litigation by governmental plaintiffs.

To interpret a statute of limitations which is silent with respect to government as not binding the state attributes that policy choice to the state itself. In *Withers et al. v. Reed,* 194 Or 541, 243 P2d 283 (1952), which concerned a statute terminating unused water rights, the court concluded that although the statute did not expressly apply to rights held by the state, its dominant policy was to return the water to potential beneficial use by others. Justice Lusk's lead opinion for three members of the court observed that *"nullum tempus occurrit regi"* depends on policies implied in the face of legislative silence. Relevant here is his quotation of "the classic exposition of the doctrine" by Justice Story in *United States v. Hoar,* 2 Mason 311, 313 (1821):

> " 'The true reason, indeed, why the law has determined, that there can be no negligence or laches imputed to the crown, and, therefore, no delay should bar its right, (though sometimes asserted to be, because the king is always busied for

the public good, and, therefore, has not leisure to assert his right within the times limited to subjects,) is to be found in the great public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers. And though this is sometimes called a prerogative right, it is in fact nothing more than a reservation or exception, introduced for the public benefit, and equally applicable to all governments. * * *' "

quoted in 194 Or at 544-545.

The "great public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers," sometimes requires belated legal action by those officers, or by their successors. Sometimes it requires legal action by private citizens in the name of the state or in other forms of action provided for the purpose. If a policy governing laches is to allow for preserving public property as well as public rights, it cannot well exclude the "proprietary" activities of public agencies. Some public agencies, like the people's utility districts in this case, exist only for "proprietary" functions of delivering goods and services; they do not "govern" people.

Why should the government, or an interested citizen, ever be barred from confining governmental action within legal bounds and from calling upon a court to declare and enforce those bounds? As this court's past opinions show, the early generalization that "the doctrine of laches is applicable to the state" was too broad. Yet the opposite need not be true, that laches never applies.

When the state sends its agencies into the market to engage in ordinary commercial and property transactions indistinguishable from those of private enterprises, the state's implied policy may be to give those transactions the same security against belated litigation of ordinary disputes. Early decisions stretched concepts such as "proprietary activity" in order to extend that security to private interests in property, particularly real property. This may explain barring the city's belated lien foreclosure in *City of Pendleton v. Holman, supra,* as well as the suits to set aside deeds in the *Warner Valley Stock Co.* and *Hyde* cases, *supra.* There is less reason to assume such a policy toward actions seeking declaratory or prospective relief from continuing a disputed transaction or condition, as in *Corvallis Sand & Gravel v. Land Board, supra.*

Assuming there is a policy implicit in the state's commercial or property transactions to secure private parties against the belated assertion of ordinary legal claims, this policy does not bar the present litigation for laches. The parties to this litigation are governmental entities, except for the ratepayers.[2] WPPSS is a statutory agency and municipal corporation of the State of Washington, composed of other public agencies of that state. *See Chemical Bank v. WPPSS,* 99 Wash2d 772, 666 P2d 329 (1983). The Participants' Agreements are not ordinary transactions with private parties in the commercial marketplace. They were designed for governmental entities, with the active participation of the federal Bonneville Power Administration (BPA), and with conscious concern about the legal powers of the participating agencies. They are agreements between governmental officials to create and conduct a publicly administered program. The implicit policy of protecting existing property interests of private persons against delayed lawsuits when a public agency has dealt with them in a conventional commercial or property transaction simply does not apply to this program. The larger policy that normally excludes laches in actions brought to assert a public interest in the conduct of a public program does apply, at least as to the municipalities that are challenging the program.

A few cases elsewhere contain statements to the contrary. In a dispute between a county and certain municipalities over the distribution of fuel taxes, an Arizona court stated the rule that "neither laches nor its generic parent, estoppel, can be asserted to gain rights against the public or to defeat a public interest." But the court then continued that "the reason for the rule denying the defense disappears when the contest is solely between two public bodies." *Maricopa County v. Cities & Towns of Avondale, Et Al,* 12 Ariz App 109, 113, 467 P2d 949 (1970). It appears that the court was influenced by the idea that some taxpayers might gain and others might lose by a judicial examination of the financial distribution. Such a rule would prevent challenges to governmental illegality merely because the private interests of the

---

[2]None of the rural electric cooperatives that have fractional participation in the Participants' Agreements are parties here, and their characterization as private or government-sponsored entities is immaterial to the present point. Nor are private lenders or suppliers to WPPSS parties to this litigation.

taxpayers of the government which acted illegally would be adversely affected by ending or correcting the illegality. That is not a persuasive reason why alleged governmental irregularities should escape scrutiny.

The Arizona court cited two other cases. In *State ex rel v. Clay County,* 226 Iowa 885, 285 NW 229, 235 (1939), a dispute about which county was liable for a person's support in the state hospital, the opinion recognized the general rule against applying "laches" to the acts of governmental agents to be "for the protection of the public," but as between two counties the court saw "no good reason why public policy should require that the people of one be penalized for the laches of the representatives of another." This Iowa opinion discussed both estoppel and laches without making a clear distinction between them. It appears that in the quoted sentence, the court addressed the effect of an earlier neglect by one county on the merits of its position rather than the procedural effect of delay in commencing the suit.

The other precedent cited by the Arizona court, *Royal Oak Tp. v. School District No. 7,* 322 Mich 397, 403, 33 NW2d 908 (1948), states that Michigan law applies the doctrine of laches between municipal corporations. But the Michigan court's full statement also rejects the rule that laches does not bar a municipality's enforcement of "public rights," apparently against anyone. Oregon law differs from Michigan. This court's decisions recognize the "public rights" exception to laches in suits by the state, *State v. Vincent, supra,* or initiated by local relators, as in the *School District No. 9* and *Port of Tillamook* cases, *supra.*

The three cases from other states do not state the law in Oregon. The directive of ORS 12.250, that the general limitation periods "shall not apply to actions brought in the name of the state, or any county, or other public corporation therein, or for its benefit," applies to actions by governmental bodies in their "proprietary" capacities. *City of Pendleton v. Holman, supra,* citing *American Surety Co. v. Multnomah County, supra, Seeck v. City of Lebanon,* 148 Or 291 (1934). About the contention that actions by municipalities should be time-barred if they concerned "proprietary activities," the court wrote:

"Had it been the intention of the legislature to subject municipalities to the operation of the statute of limitations in

their proprietary activities, it could have accomplished its purpose in one of two ways. Either it could have repealed outright § 13 of the 1862 Code of Civil Procedure, or, in the amendment of that section in 1903, it could have exempted municipalities from the operation of the statute only to the extent of their public or governmental functions. It did neither."

177 Or at 541. In a fairly recent case, *Chizek v. Port of Newport,* 252 Or 570, 450 P2d 749 (1969), the court cited ORS 12.250 and the quotation from *State Land Board v. Lee, supra,* that the principle of denying limitations against government is "to preserve public rights, revenues and property from injury and loss by the negligence of public officers." 84 Or at 434. The court allowed the port belatedly to set aside an adverse title gained by an invalid tax foreclosure, obviously a "proprietary" issue:

"When the property of one division of government is lost to another division of government and then sold to a private party, the public is not served. The only party who gains is the purchaser at the foreclosure and there is no policy reason to prefer him over a public body.

"We hold that the Port, as a public body, is not barred by the statute of limitation and the tax foreclosure proceeding is invalid and, therefore, the plaintiffs secured no title to the disputed property."

252 Or at 578.

The law in this state is that actions by the state or municipalities are not barred by the statute of limitations, irrespective whether they concern "proprietary" activities, as most civil actions do. ORS 12.250. That is the state's announced public policy on the question, and this court so treated it as recently as 1969.

It makes no sense to draw a line for imposing time limitations on declaratory judgment proceedings by a governmental plaintiff that would depend on whether the proceeding is characterized as being "in law" or "in equity." If an action under chapter 28 simply asks for a declaration of the legal rights, status, or relations of the parties, ORS 28.010, no limitation under ORS chapter 12 would apply irrespective whether the subject matter concerns "proprietary" activities. Nor would it apply to a damage action for breach of contract,

fraud, negligence, or whatever. ORS 12.250. Moreover, insertion of such a line around equitable relief arising from "proprietary" activities, as the Chief Justice's concurring opinion proposes, then carries with it a further exception for claims by governmental plaintiffs that their past actions were "ultra vires," forcing trial courts to litigate that difficult and imprecise issue at the initial stage of determining whether the plaintiff is barred by time from maintaining the litigation.

Despite expressions in some of the early opinions we have reviewed, the court's holdings do not establish such a rule. The holdings generally have rejected claims of laches against public plaintiffs asserting public rights. The few exceptions have been cases protecting a private party's reliance on past governmental property or business transactions. With governmental agencies on the opposing sides, this is not such a case. As to these contending agencies, the applicable principle, recognized in ORS 12.250 and quoted by Justice Lusk, is " 'the great public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers.' " *Withers et al v. Reed, supra,* 194 Or at 545 (quoting *United States v. Hoar,* 2 Mason 311, 313.) That principle prevents barring the cities from pursuing this declaratory judgment action against WPPSS, despite the undoubted "proprietary" character of their electric utility functions.